**Richmond**

COMMONWEALTH OF VIRGINIA

v.

STEVEN CONRAD HOLLOWAY

No. 0341-89-2

Decided September 5, 1989

COUNSEL

Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General; Thomas C. Daniel, Assistant Attorney General, on brief), for appellant.

Andrew W. Wood (Kimberley A. Williamson; Wood and Wood, on brief), for appellee.

OPINION

**BARROW, J.**—The subject of this appeal is a pre-trial order suppressing the admissibility of evidence of cocaine found in the defendant's suitcase aboard a train. The trial court ruled that the defendant had not abandoned the suitcase at the time of the seizure, and that the police illegally detained the defendant. We affirm this ruling.

The investigation leading to the seizure began at approximately 9:30 on the morning of the seizure when a special agent of the Amtrak Police Drug Enforcement Unit in Washington, D.C. reviewed a manifest of a train scheduled to run from Philadelphia to Newport News. He noticed a one-way ticket for two people purchased with cash where the reservation had been changed at the "very last moment." The reservation made at 12:05 p.m.[1] originally going from Philadelphia to Newport News, had been changed at 12:16 p.m. to go instead from Washington to Newport News. The agent testified that there was nothing unusual about two people traveling on the same ticket or for the ticket to be paid for in cash, but he said that the change in the reservation was unusual. Moreover, he identified Philadelphia as "a source city of narcotics" and explained that for this reason he had reviewed this manifest.

---

[1] The record does not explain how the agent was able at 9:30 in the morning to find on the computer transactions that would occur later in the day.

The special agent boarded the train when it left Washington and went to the last two cars where the conductor had said that he was seating passengers going to Newport News or to Norfolk. When he entered the last car he saw "two black males that were sitting midway in the last car . . . playing cards." The man sitting in the aisle seat looked up and made brief eye contact as the agent passed. When the agent reached the rear of the car and stood there momentarily, the man in the aisle seat "[l]ooked over his shoulder in . . . [the agent's] direction and then turned and spoke to the gentleman that he was playing cards with." Shortly thereafter, the agent arranged to have the Henrico police meet him when the train arrived in Richmond.

When the train arrived in Richmond, four officers met the agent and entered the last car with him. The defendant had left his seat and had gone to the restroom. When he returned from the restroom, the agent interrupted him, identified himself, and asked to see his ticket and identification. In response, the defendant pointed to the other man who was still seated. The agent then spoke to the companion who had been sitting with the defendant and asked him for his ticket. He produced a handwritten ticket with an illegible name on it. The agent then asked the companion for his identification, and the latter said that he did not have any because he had lost his wallet. The agent noticed that the man's hands were shaking when he handed him the ticket and that he was "having somewhat of a difficult time breathing."

When he inquired whether the two men had any luggage, the agent learned that both the defendant and his companion claimed to have clothing in a gray suitcase in the overhead luggage rack, and that the companion owned the suitcase. The agent explained to the companion that he was investigating the flow of illegal drugs on board the train and asked if he was carrying any contraband. The companion answered no and, at the agent's request, consented to a search of his suitcase. In the suitcase the agent found an undetermined amount of money in a brown paper bag. The agent testified that the brown paper bag was "wrinkled" and that he had personally observed money which had been received for drug purchases "wrapped in that similar fashion," but he did not describe the wrapping further.

Two matching pieces of brown luggage, one on each side of the gray piece, were also on the overhead rack. When the agent in-

quired about the brown luggage, the companion said that he did not know who owned it. Then, according to the agent, the defendant said "No" when asked, "[d]o you know who these bags belong to?" The defendant contradicted this statement when he testified that, although he never acknowledged ownership of the luggage, he did not deny that he owned them. The agent then reached up and took one of the brown suitcases and asked passengers sitting in the immediate area if the suitcases belonged to anyone. When they all responded negatively, he took custody of both brown suitcases and carried them off the train with him. Shortly thereafter, the police officers escorted the defendant and his companion off the train.

A dog trained to identify the presence of drugs by smell alerted to all three bags, including the gray one, indicating the presence of drugs in each of them. A search revealed cocaine in one of the brown bags.

The Commonwealth contends that it was not unreasonable for the police to detain the defendant and his companion for the period of time between the discovery of the money in the gray suitcase and the search of the two brown suitcases following the dog's alert to the presence of drugs. It also contends that the defendant had no expectation of privacy in the brown bags because he denied ownership of the bags.

■ To justify detaining the defendant, the agent had to have a reasonable and articulable suspicion of criminal activity on the part of the defendant. *United States v. Sokolow*, 490 U.S. 1, 2 (1989); *Terry v. Ohio*, 392 U.S. 1, 30 (1968). We conclude that the trial court did not err in finding that the agent did not have such a suspicion.

Prior to boarding the train the facts known to the agent were not indicative of criminal activity. According to the agent, it was not unusual for two people to be traveling on the same ticket, nor was it unusual for a ticket to be paid for in cash. Only the changing of the reservation appeared unusual to him, and the agent did not explain how this event, even if unusual, demonstrated possible criminal activity. Thus, as the agent boarded the train he had no basis for detaining anyone for investigation.

Furthermore, the agent never identified the defendant and his companion as the same two people whose reservation had first aroused his interest. Therefore, even if the change in reservation was an unusual event, without a determination that the defendant was one of the persons for whom that reservation was changed, this event could not, later, have contributed to the agent's suspicion of the defendant.

After the agent boarded the train, the additional information he acquired did not provide a reasonable suspicion that the defendant may have been engaged in criminal activity. Neither the eye contact he had with the defendant's companion, the defendant's lack of identification, nor the presence of money in his companion's suitcase gave rise to an articulable suspicion that the defendant may have been committing a crime.

The brief eye contact the agent had with the defendant's companion had no articulable significance. The mere fact that travelers may look at each other does not justify a suspicion of wrongdoing. *See Reid v. Georgia*, 448 U.S. 438, 441 (1980); *Taylor v. Commonwealth*, 6 Va. App. 384, 389, 369 S.E.2d 423, 425 (1988).

▮ The defendant's lack of identification did not justify his detention. A person may not be detained and required to identify himself. *Brown v. Texas*, 443 U.S. 47, 53 (1979). Nor may he be punished for refusing to identify himself. *Id*. A person may refuse to answer questions from the police, *Kolender v. Lawson*, 461 U.S. 352, 365 (Brennan, J., concurring) (1983); and his refusal is not indicative of the commission of a crime. *United States v. Welker*, 689 F.2d 167, 169 (10th Cir. 1982).

The presence of money in the companion's suitcase did not indicate criminal activity. Without evidence of the amount of the money, the denominations of the money, and an explanation as to why the wrapping of the money resembled evidence of a drug transaction as opposed to any other transaction, the presence of money in a traveler's luggage is no reason to suspect criminal activity.

We further find that when considered as a whole, the information the agent acquired after boarding the train did not provide a reasonable suspicion that the defendant may have been engaged in

criminal activity. There is no relationship between brief eye contact between two travelers on a train, a person's lack of identification, and the presence of money in a traveler's luggage, nor was any suggested in this case. Therefore, none of these observations can be said to have enhanced the validity of any other as a predictor of criminality. In fact, two of the observations, the eye contact and the money in the luggage, related to the defendant's companion, not to the defendant. Although, perhaps, the basis of an "unparticularized suspicion" prompting the agent to continue to watch the two travelers, these observations when considered together still failed to indicate that the defendant may have been engaged in criminal conduct.

In addition, the trial court, as trier of fact, determines the weight of the evidence and the credibility of the witnesses. *Davis v. Commonwealth*, 230 Va. 201, 206, 335 S.E.2d 375, 379 (1985). The agent's testimony was internally conflicting. The time at which he testified he had obtained the train's manifest showing the last minute change in reservations was before the change had occurred. His testimony also conflicted with the defendant's over whether the defendant disclaimed ownership of the luggage. Given these conflicts the trial court was entitled to disbelieve all or part of the agent's testimony. *Speight v. Commonwealth*, 4 Va. App. 83, 88, 354 S.E.2d 95, 98 (1987).

Finally, the trial court may have given the basis for the agent's suspicion little or no weight because the factors he relied upon, either individually or collectively, failed to persuade him that an articulable suspicion existed or because the agent's testimony, itself, was not persuasive. Since the defendant prevailed in the trial court, we may not assume otherwise. *Penn v. Pemberton & Penn, Inc.*, 189 Va. 649, 653, 53 S.E.2d 823, 825 (1949).

For these reasons, we conclude that the trial court did not err in finding that the agent had no reasonable and articulable suspicion for suspecting that the defendant may have been engaged in criminal activity. Therefore, the agent was not justified in detaining the defendant or seizing and searching his luggage.

The Commonwealth contends that, even if the agent did not have justification to detain the defendant, the defendant may not now object to the seizure of his luggage because he abandoned it, voluntarily surrendering his expectation of privacy in it. A war-

rantless seizure of abandoned property is not a violation of the Fourth Amendment. *United States v. Thomas*, 864 F.2d 843, 845 (D.C. Cir. 1989). One who voluntarily abandons property forfeits any expectation of privacy he or she may have in it. *Id.* Therefore, he or she has no standing to complain of the property's search and seizure. *United States v. Kendall*, 655 F.2d 199, 200 (9th Cir. 1981).

■ Abandonment in the context of the Fourth Amendment is different from the property law concept of abandonment. *Thomas*, 864 F.2d at 845; *United States v. Jackson*, 544 F.2d 407, 409 (9th Cir. 1976). A person may retain a property interest in personal property while, at the same time, relinquishing his or her reasonable expectation of privacy in that property. *Id.* A person's "[i]ntent to retain a reasonable expectation of privacy" determines whether the property has been abandoned so as to permit its seizure without a warrant. *Kendall*, 655 F.2d at 200.

■ Whether a person intends to retain a reasonable expectation of privacy in property is to be determined by objective standards. *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986); *Kendall*, 655 F.2d at 201; *contra United States v. Knox*, 839 F.2d 285, 293 (6th Cir. 1988). Such an intent may be inferred from words, acts, and other objective facts. *Nordling*, 804 F.2d at 1469; *Jackson*, 544 F.2d at 409.

■ The determination of this intent must be made after consideration of all relevant circumstances, but two factors are particularly important: denial of ownership and physical relinquishment of the property. *Nordling*, 804 F.2d at 1469. If a person relinquishes possession and disclaims ownership of personal property, he or she surrenders any expectation of privacy in that property. *United States v. McKennon*, 814 F.2d 1539, 1546 (11th Cir. 1987). Also, repeated disclaimers of ownership generally constitute a relinquishment of an expectation of privacy. *Id.*

■ Every disclaimer of ownership of personalty, however, does not conclusively establish the intent to relinquish one's expectation of privacy. *United States v. Hawkins*, 681 F.2d 1543, 1546 (11th Cir. 1982). Since a claim of ownership does not always determine one's right to protection of the Fourth Amendment, a disclaimer of ownership, although a strong indication of such a relinquishment, is not conclusive. *Id.* Similarly, an absence of assertion of

ownership does not necessarily constitute abandonment. *Jackson*, 544 F.2d at 410; *see also Walter v. United States*, 447 U.S. 657, 658 n.11 (1980).

Whether relinquishing physical possession of personal property represents a voluntary abandonment of one's expectation of privacy depends upon the nature of the act and the circumstances surrounding the act. For example, a traveler in an airport who puts a suitcase down and walks a few steps away has not necessarily indicated an intent to abandon the suitcase. *Jackson*, 544 F.2d at 410. On the other hand, the driver of an automobile who, when the vehicle caught on fire, pulled off to the side of the highway, got out of the vehicle, left the scene in another automobile and had not returned two to three hours later, was deemed to have abandoned and, therefore, forfeited his expectation of privacy in a briefcase in the trunk of the burning automobile. *United States v. Oswald*, 783 F.2d 663, 667 (6th Cir. 1986).

■ Abandonment must be "truly voluntary and not merely the product of police misconduct." *United States v. Roman*, 849 F.2d 920, 923 (5th Cir. 1988). Therefore, a verbal disclaimer of an interest in a suitcase obtained from the defendant by the police during an illegal arrest, cannot be considered as evidence of abandonment. *Jackson*, 544 F.2d at 410.

■ Our standard for reviewing the trial court's decision is well settled. A trial court's finding that there has not been an abandonment is a factual finding which, even when arguably mixed with questions of law, is subject to attack only if clearly erroneous. *United States v. Brady*, 842 F.2d 313, 315-16 (D.C. Cir. 1988); *Roman*, 849 F.2d at 922; *McKennon*, 814 F.2d at 1545; *Nordling*, 804 F.2d at 1469; *Kendall*, 655 F.2d at 203.

In this case, the trial court expressly found that the two brown suitcases were not abandoned by the defendant. The Commonwealth argues that the court erred because the defendant disclaimed ownership of the luggage and, therefore, forfeited his expectation of privacy in it.

Evidence that the defendant disclaimed ownership of the luggage was conflicting. Although the agent testified that the defendant told him that he did not know who the bags belonged to, the defendant, while acknowledging the agent's inquiry about the

bag's ownership, testified that he did not deny ownership of the bags.

This conflict in the evidence must be resolved on appeal in the defendant's favor because he was the prevailing party in the motion to suppress which is before us in this appeal. We are required to review the evidence "with the conflicts in it and the fair inferences from it settled as determined" by the fact finder. *Russo v. Commonwealth*, 207 Va. 251, 252, 148 S.E.2d 820, 822 (1966). Since the trial court granted defendant's motion to suppress the evidence and found that the defendant did not abandon his luggage, we must view the conflicting evidence as resolved in the defendant's favor. Therefore, our review is premised on the implicit finding that the defendant did not disclaim ownership of the luggage.

The remaining evidence is not contrary to the trial court's finding that the defendant had not abandoned the luggage. The defendant's failure to respond to the agent's inquiry concerning ownership of the luggage need not be interpreted as abandonment. Having been advised by the agent that he was investigating for illegal drugs on board the train, the defendant, whose assertion of ownership may have been incriminating, chose to remain silent in the face of police questioning. He had a right to remain silent. *Florida v. Royer*, 460 U.S. 491, 502 (1983). The failure of other passengers in the vicinity to claim ownership is not evidence of the defendant's abandonment of ownership nor is it evidence that the true owner had abandoned the luggage. The luggage was in a proper place for storage, and the owner may not have chosen to answer or been available when the agent inquired of passengers in the vicinity.

Consequently, the trial court was not clearly erroneous in finding that the defendant did not exhibit an intent to relinquish his expectation of privacy in the brown suitcases. When viewed in the light most favorable to the defendant, the evidence supports the trial court's ruling.

In summary, we hold that the trial court did not err in finding that the defendant had standing to assert his right to be free from an illegal seizure and that the search was illegal since the Amtrak agent did not have an articulable suspicion of criminal activity. Accordingly, the order of the trial court granting the defendant's

motion to suppress evidence of the cocaine is affirmed.

*Affirmed.*

Coleman, J., and Keenan, J., concurred.