COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Russell and Athey
Argued by teleconference


COMMONWEALTH OF VIRGINIA

                                          MEMORANDUM OPINION* BY
v.        Record No. 1515-19-3           JUDGE WESLEY G. RUSSELL, JR.
                                              MARCH 3, 2020
DAMIAN RYAN EUTSLER


              FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
                      W. Chapman Goodwin, Judge[1]

          Victoria Johnson, Assistant Attorney General (Mark R. Herring,
          Attorney General, on briefs), for appellant.

          David B. Hargett (Hargett Law, PLC, on brief), for appellee.


        Pursuant to Code § 19.2-398(A)(2), the Commonwealth of Virginia appeals the trial

court's pretrial order granting Damian Ryan Eutsler's motion to suppress a portable hard drive

belonging to Eutsler and the evidence it contains.  Specifically, the trial court suppressed "the

portable hard drive . . . and all evidence thereon[,]" including 20,000 images of child

pornography that investigators had found on the hard drive.[2]  Although we affirm certain rulings

_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] In the proceedings below, Eutsler filed multiple motions to suppress related to the hard
drive and the images it contains.  Prior to his retirement, Judge Victor V. Ludwig presided over
hearings related to motions to suppress on August 23, 2018 and October 30, 2018 and issued
orders and letter opinions as a result of those hearings.  Judge Goodwin presided over the August
16, 2019 hearing and issued both a letter opinion and order, which expressly incorporated Judge
Ludwig's prior letter opinions.  Judge Goodwin's September 16, 2019 order, which resulted from
the issues argued at the August 16, 2019 hearing, is the order that suppressed "the portable hard
drive . . . and all evidence thereon[.]"

        [2] As a result of the discovery of the images on the hard drive, the Commonwealth elected
to charge Eutsler with the following crimes:  one count of possession of child pornography, in
violation of Code § 18.2-374.1:1(A); forty-nine counts of possession of child pornography,

of the trial court, we conclude that the trial court erred in suppressing the evidence found on the hard drive. Accordingly, we reverse the judgment of the trial court regarding suppression of the evidence and remand the matter to the trial court for further proceedings consistent with this opinion.

BACKGROUND[3]

On November 22, 2016, Detective Byrne of the Lynchburg Police Department investigated a file-sharing network searching for people sharing child pornography. Using a computer running investigative software, Byrne connected to a device containing, among other pornographic images, a video of multiple male and female children engaged in sexual acts with adults. On November 23, 2016, Byrne obtained a court order from Lynchburg Circuit Court allowing him to obtain the subscriber information associated with the IP address associated with the device; the device was identified as a cell phone belonging to Dixie Oil and Gas Corporation located in Verona. After further investigation, Byrne determined that the alleged offense occurred in Augusta County and turned his investigation over to the Augusta County Sheriff's Department (Department).

---

second or subsequent offense, in violation of Code § 18.2-374.1:1(B); one count of reproduction of child pornography, in violation of Code § 18.2-374.1:1(C)(i); and forty-nine counts of reproduction of child pornography, second or subsequent offense, in violation of Code § 18.2-374.1:1(C)(i). Although other charges were filed against Eutsler in connection with what was discovered on the cell phone, only the 100 charges related to images discovered on the hard drive are the subject of this appeal.

[3] In general, when reviewing a trial court's decision to grant a motion to suppress evidence, we view the facts in the light most favorable to the prevailing party below, in this case Eutsler, and grant him all reasonable inferences fairly deducible therefrom. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067 (1991). The exception to this general rule is when the trial court expressly makes a specific factual finding. We are bound by such factual findings and "will not . . . set [them] aside unless they are plainly wrong or without evidence to support them." Frouz v. Commonwealth, 296 Va. 391, 399 (2018) (quoting Riverside Owner, L.L.C. v. City of Richmond, 282 Va. 62, 75 (2011)). In resolving this appeal, we consider the evidence in light of these principles; however, in order to provide context for some of the rulings and findings of the trial court, we include in the recitation of the underlying facts some testimony that we must reject given these principles.

The Department confirmed that the cell phone belonged to Dixie Oil and Gas and learned that it was a company cell phone assigned to Eutsler. On December 8, 2016, Investigator Conner Tobin met with Chris Earhart, part of the management team at Dixie Oil and Gas, and Earhart confirmed that the cell phone in question was a company phone. Earhart allowed Tobin to take possession of the phone. Eutsler was at work, but agreed to accompany investigators to the sheriff's office for an interview. After officers read Eutsler his <u>Miranda</u> rights, Eutsler admitted to using the file-sharing software that led to the discovery of his actions, to downloading child pornography, and to taking voyeuristic pictures of women in public. Eutsler was then arrested for possession of child pornography. Dixie Oil and Gas fired Eutsler on December 9, 2016.

Eutsler remained in custody from the date of his arrest until he was released on bond on December 19, 2016. On that date, he was served with a "Trespass Notice" form provided by the Department. It informed Eutsler that he was banned from Dixie Oil and Gas property and was subject to trespassing charges if he violated the ban. Accordingly, although he was no longer jailed, Eutsler still had no ability to return to Dixie Oil and Gas to retrieve his personal effects.

Banned from the property, Eutsler took steps to try to recover his personal effects, including the hard drive, that were still at Dixie Oil and Gas. Specifically, he communicated with Roger Bowling, a co-worker and "friend," and asked him to retrieve the hard drive. Although in the proceedings below there was a great deal of dispute as to the specifics of what Eutsler asked Bowling to do and where he told him he could find the hard drive, it is undisputed that Eutsler asked Bowling to go to Dixie Oil and Gas and get the hard drive.[4]

_____

[4] According to Bowling, Eutsler told him that the hard drive was hidden in the parts room, an area to which all employees of the company had access. Bowling further testified that Eutsler did not ask him to return the hard drive, but rather, told him "'to take it and get rid of it.'" Eutsler denied that he told Bowling to get rid of the hard drive or that it was hidden in the parts room. According to Eutsler, Bowling was to retrieve the hard drive for Eutsler and that the hard drive was located either in Eutsler's office at the company or in the company vehicle assigned to Eutsler. Eutsler made clear that the hard drive was not kept in the common-area parts room as

- 3 -

On December 26, 2016, Bowling went to Dixie Oil and Gas and recovered the hard drive. He neither "g[o]t rid of it" nor returned it to Eutsler. Rather, Bowling decided to access the contents of the hard drive while on company property; however, he recognized that he did not have the necessary equipment to do so. The hard drive could not be connected to a computer through a regular USB cord; instead, it required a device Bowling referred to as a "V cord." Bowling went to a local Walmart and purchased a V cord. He then used the V cord to access the contents of the hard drive, which was not password protected, on a computer at Dixie Oil and Gas.

When asked why he decided to access the hard drive rather than returning it to Eutsler or "getting rid of it" as he claimed he had been asked to do, Bowling testified that his reason for doing so was tied to a request from Eutsler's girlfriend. According to Bowling, she asked him to access the hard drive to see whether it contained the security code for a storage unit where Eutsler's boat was kept.[5]

---

contended by Bowling. Although the trial court expressly declined to make a finding as to where the hard drive was located, it specifically found that Bowling's testimony was "incredible in large part[.]" This finding, coupled with the dictate that, absent an express factual finding by the trial court to the contrary, we must view the evidence in the light most favorable to Eutsler as the prevailing party, Grimstead, 12 Va. App. at 1067, we must conclude that the hard drive was left not in a common area, but rather, either in Eutsler's assigned office or company vehicle.

[5] The trial court cited Bowling's "bizarre" explanation of why he accessed the contents of the hard drive as a principal reason it found him to be incredible. Specifically, the trial court noted in its December 31, 2018 letter opinion that

> [i]n addition to being bizarre on its face, this yarn is unbelievable in light of the other facts that have been made available to the [trial c]ourt. Eutsler and Bowling were friends. Bowling visited Eutsler at his home, then called Eutsler to offer to help him. According to both parties, Eutsler trusted Bowling to gather his property from their workplace. When Bowling did so, Eutsler was not in jail or otherwise unreachable; he was at home—a fact which Bowling clearly knew, having only recently spoken to Eutsler face-to-face. If Bowling was truly assisting an innocent effort by [Eutsler's girlfriend] to secure Eutsler's boat, he could have simply asked Eutsler for the "gate lock" password, or better yet, he could have suggested that [the girlfriend] do so herself. Instead, Bowling

Having accessed the contents of the hard drive, Bowling encountered child pornography. According to Bowling, he immediately shut down the computer and disconnected the hard drive. He informed Earhart of what he had discovered and gave the hard drive to Earhart, who locked it in a file cabinet.

Earhart then contacted the Department. He informed the Department that he had Eutsler's hard drive and that child pornography had been discovered on it. Earhart was advised to maintain possession of the hard drive for law enforcement, who took possession of it the next day. The trial court made an express factual finding that, when the hard drive came into the Department's possession, investigators knew that it contained child pornography.

On the day the hard drive came into the Department's possession, Investigator Cason of the Department used a computer to access some of the information stored on the hard drive. In short order, he encountered child pornography. Upon seeing the child pornography, he disconnected the hard drive and placed it in the Department's evidence storage room.

The Department took no further action regarding the hard drive for some time. Eventually, on February 7, 2017, Investigator Tobin of the Department sought a search warrant related to the contents of the hard drive. A magistrate issued the warrant on that day. The next day, Tobin transported the hard drive to the Spotsylvania County Sheriff's Office, where it was forensically examined by a member of the Office of the Attorney General's computer crimes unit.

When asked why it took more than forty days from the time the Department first possessed the hard drive until it sought a search warrant, Tobin indicated that the Department was busy with

---

would have the [trial c]ourt believe that he purchased new hardware from Walmart in order to fish aimlessly though Eutsler's [h]ard [d]rive for information he did not know was there, for a mutual friend, in defiance of the specific request that Eutsler made to him.

(Footnote omitted).

other investigations.  As summarized by the trial court, Tobin testified that the delay was explained by

> two murder investigations.  One of those was actively being investigated.  The other was a cold case that was "heating up." The [trial c]ourt was not made aware as to what constituted "heating up" other than new information had been obtained. Although the [Department] only has three investigators, no other reason for the delay was proffered to the [trial c]ourt.

No evidence was adduced regarding manpower issues with the Office of the Attorney General's computer crimes unit, the entity that actually conducted the examination of the hard drive once the Department obtained a warrant.

Against this factual backdrop, Eutsler filed multiple motions to suppress the evidence found on the hard drive.  The first asserted that the evidence should be suppressed because law enforcement had handled the hard drive improperly by accessing it without first making a forensic copy, effectively altering the hard drive's "metadata" by the very act of looking at the data it contained.  In a December 4, 2018 order, the trial court denied the motion.

Eutsler again moved to suppress, this time on Fourth Amendment grounds.  A hearing on the motion was held on October 30, 2018.

At the outset of the hearing, the Commonwealth argued that Eutsler did not have a sufficient interest in the hard drive to allow him to raise a Fourth Amendment challenge to either its seizure or a search of it.  Specifically, the Commonwealth argued that Eutsler, in effect, had abandoned the hard drive, and thus, no longer had a Fourth Amendment interest in it to assert.  Faced with a potentially dispositive argument, the trial court effectively bifurcated the motion to suppress, electing to hear argument regarding only the "predicate issue" of whether Eutsler retained a Fourth Amendment interest in the hard drive that would allow him to seek suppression of any evidence found on it and leaving for another day the "issue of admissibility of [that] evidence[.]"

The trial court heard both evidence and argument on this predicate question at the October 30, 2018 hearing. At the conclusion of the hearing, the trial court directed the parties to brief the issue of whether Eutsler retained a sufficient interest in the hard drive to allow him to seek suppression of its contents on Fourth Amendment grounds.

Eutsler filed his brief as directed. In a section he labeled "Standing," Eutsler argued that he had not abandoned the hard drive, and thus, retained a "reasonable expectation of privacy" in the hard drive and its contents. From this premise, Eutsler concluded he had "standing . . . to challenge the seizure by the Commonwealth of the" hard drive. As directed, the Commonwealth filed its response, asserting that Eutsler had abandoned the hard drive, and thus, had no "reasonable expectation of privacy" in it. From this premise, the Commonwealth argued that Eutsler "did not have a reasonable expectation of privacy in the [hard drive], [and] therefore [did] not have standing to object to its search."

The trial court issued a letter opinion on December 31, 2018, addressing Eutsler's ability to assert Fourth Amendment interests in the hard drive. Before analyzing that question, the trial court addressed certain preliminary issues regarding the scope of the opinion. The trial court made clear that it was addressing only Eutsler's ability to raise a Fourth Amendment claim regarding the hard drive and not whether any such claims were valid. Specifically, the trial court wrote that its ruling "does not end the inquiry into the merits of the [m]otion [to suppress]; rather, it only ensures that Eutsler may now proceed with it." Furthermore, the trial court acknowledged that the parties and some of the case law had used the terms "standing" and "reasonable expectation of privacy" interchangeably in describing whether Eutsler possessed a sufficient interest in the hard drive to pursue a Fourth Amendment challenge. The trial court indicated that, in the letter opinion, it would follow the more recent trend and utilize the phrase "'reasonable expectation of privacy'" to describe whether Eutsler possessed a sufficient interest to raise a Fourth Amendment claim.

The trial court then reviewed the evidence, made credibility findings regarding the witnesses, and analyzed its factual findings in light of the applicable case law. The trial court found that Eutsler had not abandoned the hard drive and that he retained a sufficient expectation of privacy to allow him to raise a Fourth Amendment challenge. Specifically, the trial court concluded that "Eutsler had a reasonable expectation of privacy to permit him to challenge the *search* of the [h]ard [d]rive." (Emphasis added). The trial court also rejected the Commonwealth's argument that Eutsler, either by his actions or through the actions of others, had consented to the ultimate search of the hard drive.

Prior to a hearing on the merits of his motion to suppress, Eutsler filed a supplemental motion to suppress asserting that Cason's accessing some of the images on the hard drive without a warrant on December 27, 2016, constituted an illegal search. He asserted that the Department's continued possession of the hard drive for more than forty days without seeking a warrant rendered the Department's possession of the hard drive unreasonable, and thus, a violation of his Fourth Amendment rights.

A hearing on the merits of Eutsler's motion to suppress, including the grounds set forth in the supplemental motion, was held on August 16, 2019. After hearing evidence and argument regarding the motion, the trial court took the matter under advisement.

On September 10, 2019, the trial court issued a letter opinion regarding the matter. The trial court incorporated by reference the prior rulings and letter opinions that had been made in the matter. It also made certain factual findings. It concluded that neither Bowling nor Earhart were agents of law enforcement when they took possession of and/or accessed the hard drive before

- 8 -

turning it over to authorities. It also concluded that investigators knew that there was child pornography on the hard drive *before* Cason accessed the hard drive on December 27, 2016.[6]

Although recognizing that the police being given the hard drive by Earhart did not constitute a Fourth Amendment seizure, the trial court concluded that the Department's continued possession of it for more than forty days without seeking a search warrant altered the equation. In essence, the trial court concluded that the passage of time converted the Department's lawful possession of the hard drive into an unreasonable seizure. The trial court reasoned that the prior finding that Eutsler retained a reasonable expectation of privacy in the device meant that "his possessory interest[s in it] were not diminished." Furthermore, the trial court found that the Department had not diligently pursued the investigation and rejected its lack of manpower rationale, finding that

> [e]ven considering the holiday season, the one active murder investigation, another "cold case" murder investigation that was "heating up," and that [the Department] only has three investigators, it is not reasonable that investigators, who knew that the [hard drive] contained child pornography, failed to obtain a search warrant for forty-one days.

Having concluded that the lack of diligence rendered the Department's continued possession of the hard drive unreasonable under the Fourth Amendment, the trial court suppressed the "hard drive and all evidence thereon."

The Commonwealth noted an appeal, asserting two assignments of error. The first, a challenge to the trial court's initial abandonment ruling, asserts that the trial court erred in finding that Eutsler had standing to challenge the search of the hard drive. The second, which challenges

---

[6] The trial court made the finding in its discussion of whether Cason's accessing the contents of the hard drive without having obtained a warrant violated the Fourth Amendment. The trial court found that law enforcement "knew [the hard drive] contained child pornography" when they obtained it from Earhart and that Cason "knew [the hard drive] contained child pornography and searched it anyway." Given that its ruling on another issue led it to grant the motion to suppress, the trial court elected "not [to] rule upon the remaining constitutional issue regarding Investigator Cason's initial search of the" hard drive. Accordingly, that issue is not before us in this appeal.

- 9 -

the trial court's ruling regarding the reasonableness of the Department's continued possession of the hard drive without seeking a warrant, asserts that the trial court erred in concluding that the more than forty-day delay in seeking the warrant converted the Department's lawful possession of the hard drive into an unreasonable seizure in violation of the Fourth Amendment.

## ANALYSIS

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" The Amendment's protection against both unreasonable searches and unreasonable seizures serves to protect differing interests a citizen has in his property. As the United States Supreme Court has explained, "[d]ifferent interests are implicated by a seizure than by a search. A seizure affects only the person's possessory interests; a search affects a person's privacy interests." Segura v. United States, 468 U.S. 796, 806 (1984) (internal citations omitted). Regardless of whether the law enforcement action is alleged to have infringed on privacy or possessory interests, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Riley v. California, 573 U.S. 373, 381-82 (2014) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). Thus, our review centers on whether the trial court correctly determined that the actions of law enforcement regarding the hard drive were unreasonable.

### I. Eutsler's Procedural Challenges

As a preliminary matter, Eutsler argues that the merits of the Commonwealth's appellate arguments are not properly before us. First, he asserts that both assignments of error must be dismissed because the initial petition filed by the Commonwealth, which was timely filed,[7] did

---

[7] The Commonwealth filed its notice of filing transcripts with the clerk of the trial court on October 8, 2019. Pursuant to Code § 19.2-402(B), the petition for appeal had to be "filed with the clerk of the Court of Appeals not more than 14 days after the notice of transcript or written statement of facts required by § 19.2-405 is filed[.]" Thus, the Commonwealth's petition

- 10 -

not include with the assignments of error "[a]n exact reference to the page(s) of the transcript, written statement of facts, or record where the alleged error has been preserved in the trial court" as provided for in Rule 5A:12(c)(1).  He further contends that the Commonwealth's amended petition for appeal correcting that deficiency cannot be considered a valid filing under the rules and statutes governing Commonwealth's appeals.  Next, Eutsler argues that the Commonwealth's first assignment of error is not properly before us because it asserts that the trial court erred in finding that he had standing to bring his Fourth Amendment challenge while the trial court actually concluded that he had a sufficient expectation of privacy to allow him to assert a Fourth Amendment violation.  Finally, he argues that the Commonwealth's first assignment of error asserts a challenge to the trial court finding standing to "search," but the trial court suppressed the evidence as a result of an unreasonable seizure.  According to Eutsler, this discrepancy requires us to reject the assignment without reaching its merits.

Eutsler's procedural default arguments require interpretation of relevant portions of the Code of Virginia and the Rules of the Supreme Court.  Thus, he raises "question[s] of law that we review *de novo*."  Minor v. Commonwealth, 66 Va. App. 728, 738 (2016).

A.  Preservation References

It is undisputed that the initial petition for appeal that the Commonwealth filed in this Court was filed within the time deadline and that said petition did not include "[a]n exact reference to the page(s) of the transcript, written statement of facts, or record where the alleged error has been preserved in the trial court" as provided for in Rule 5A:12(c)(1).  Upon receipt of the petition for appeal that lacked such references, the Clerk of this Court, on October 28, 2019,

---

for appeal had to be filed on or before October 22, 2019.  The petition for appeal was filed in this Court on October 21, 2019.  See Rule 5A:3(d) (regarding filing by mail).

sent a notice of the deficiency to counsel. The notice provided that the Commonwealth needed to file a petition, labeled an amended petition, correcting the deficiency within ten days.

In response, the Commonwealth filed an amended petition for appeal containing the missing references on October 31, 2018. Thus, the corrected petition was filed well within the ten-day period specified in the Clerk's notice, but outside the time period specified in Code § 19.2-402(B).

Although we consistently and routinely issue such notifications to appellants whose petitions contain similar, non-jurisdictional defects and despite the Commonwealth's correction of the deficiencies within the time frame specified by the Court in the notification, Eutsler asserts that we must dismiss the appeal. Specifically, he cites Commonwealth v. Square, No. 2526-11-2 (Va. Ct. App. June 12, 2012), and argues that the rules and statutes governing Commonwealth's appeals must be strictly construed. He reasons that, until the Commonwealth files a petition that is compliant with all of Part 5A of the Rules of the Supreme Court, it has not filed a petition for appeal at all. Accordingly, he argues that "the failure to include the references to where the alleged error had been preserved [had to] be corrected, if at all," within the fourteen-day period specified in Code § 19.2-402(B).

We recently addressed and rejected this argument in Commonwealth v. Stanley, No. 0962-19-3 (Va. Ct. App. Nov. 12, 2019). We concluded that the failure to include the references specified in Rule 5A:12(c)(1) was a non-jurisdictional defect "subject to the provisions of Rule 5A:1(A)(a)[.]" Id. at *17. We then held that the Commonwealth's amended petition correcting the non-jurisdictional defect related back to the initial filing, holding that the corrected filing represents the correction of

> a deficiency in a pleading that already has been filed timely and
> not . . . the filing of a new pleading outside of the filing
> deadline. . . . Because the asserted deficiencies were not

- 12 -

> jurisdictional and were corrected consistent with Rule 5A:1A(a),
> we decline to dismiss the Commonwealth's appeal in this matter.

Id.

Like Eutsler, Stanley argued that our decision in Square required a different result. In Square, the Commonwealth's petition for appeal did not include any assignments of error. Square, No. 2526-11-2, at *1-2. Unlike the situation in the instant case or in Stanley, we determined that the failure to include any assignments of error at all represented a jurisdictional defect that could not be cured by a subsequent filing and required dismissal of the appeal. Id. at *8. Such jurisdictional defects are different in kind than the defects at issue here and in Stanley, and thus, Square is distinguishable. As we observed in Stanley,

> [u]nlike the failure to include assignments of error, neither the
> rules nor our prior decisions suggest that a failure to include a
> reference to where in the record an alleged error is preserved or the
> failure to include the standard of review applicable to those
> assignments of error are jurisdictional defects requiring dismissal.

Stanley, No. 0962-19-3, at *16.

Finding the reasoning of Stanley persuasive, we adopt it here. Accordingly, we conclude that the Commonwealth's petition for appeal is properly before us.

### B. Standing Versus Reasonable Expectation of Privacy

Eutsler asserts that the Commonwealth's first assignment of error is not properly before us because it "does not challenge the trial court's ruling that Eutsler had a *reasonable expectation of privacy*[,]" but rather, challenges a "'finding' that Eutsler 'had *standing*'" to raise his Fourth Amendment arguments. (Second emphasis added). In essence, Eutsler argues that the Commonwealth's first assignment of error is fatally flawed because it fails to comply with Rule 5A:12(c)(1)(ii)'s requirement that "[a]n assignment of error . . . address the findings, rulings, or failures to rule" of the "trial court . . . from which an appeal is taken[.]" See Coleman v. Commonwealth, 60 Va. App. 618, 621 (2012).

- 13 -

Central to Eutsler's argument is his assertion that a finding that a person has "standing" to bring a Fourth Amendment challenge is different in kind from a finding that a person has a "reasonable expectation of privacy" that allows him to raise a Fourth Amendment challenge. Because we reject Eutsler's assertion that, in this context, the terms are different in kind, we also reject his argument that the Commonwealth's assignment of error is flawed in this regard.

In the context at issue here, findings of "standing" and "reasonable expectation of privacy" are shorthand ways of stating that a person has a sufficient interest to allow him to raise a Fourth Amendment challenge. Although the "reasonable expectation of privacy" formulation has become more common, both courts and litigants have used the phrases interchangeably over the years with both being clear references to a person having a sufficient interest to raise a Fourth Amendment challenge. See, e.g., Rakas v. Illinois, 439 U.S. 128, 140 (1978) (addressing the parties' Fourth Amendment standing argument before concluding that the issue is better described using the privacy rubric "of substantive Fourth Amendment law"); Hurley v. Commonwealth, 36 Va. App. 83, 88 n.1 (2001) (defining the Fourth Amendment "standing" inquiry as whether a person has "a legitimate expectation of privacy" (internal quotation marks and citation omitted)); Commonwealth v. Holloway, 9 Va. App. 11, 18 (1989) (recognizing that a person who lacks an "expectation of privacy" in an object lacks "standing to complain of the property's search and seizure").

Any suggestion that the parties did not view the terms as interchangeable is belied by the arguments made below. Both parties used both terms in the proceedings below when arguing whether Eutsler had a sufficient interest to raise a Fourth Amendment challenge. In fact, in his brief in the trial court *Eutsler* used the heading "standing" to label the section of the brief in which he discussed having a "reasonable expectation of privacy" in the hard drive and its contents.

Further, he concluded his brief by arguing that he had "standing" to raise his Fourth Amendment challenge. Clearly, as argued by the parties below, the terms meant the same thing.

That the terms had been used interchangeably by the parties and understood to mean the same thing is further borne out by the trial court's December 31, 2018 letter opinion. In it, the trial court notes that courts have used the terms interchangeably and that, prior to Rakas, "'standing' . . . was the standard short-hand term" for whether a person had a sufficient interest to raise a Fourth Amendment challenge. Although the trial court went on to explain that it would utilize the more modern phrasing of "'reasonable expectation of privacy[,]'" the mere fact that it engaged in the discussion demonstrates that, in the proceedings below, everyone understood the terms to have been used interchangeably.

Because, in this context, "standing" and "reasonable expectation of privacy" are different ways of saying the same thing, *i.e.*, that a person has a sufficient interest to raise a Fourth Amendment claim, the Commonwealth's assignment of error does challenge a ruling made by the trial court. Accordingly, the assignment of error satisfies the requirements of Rule 5A:12(c)(1)(ii), and Eutsler's challenge to the assignment of error in this regard is not well founded.

## C. Search Versus Seizure

In a similar vein, Eutsler next argues that the first assignment of error does not challenge a ruling of the trial court in that "the Commonwealth specifically assigned error to 'standing to challenge the *search* of the hard drive[,]'" but "the trial court ultimately granted the motion to suppress because there was an unconstitutional seizure, not an unconstitutional search." (Emphasis added). In essence, Eutsler again argues that the Commonwealth's first assignment of error is fatally flawed because it fails to comply with Rule 5A:12(c)(1)(ii)'s requirement that an assignment of error address a ruling that the trial court actually made. See Coleman, 60 Va. App. at 621.

- 15 -

As Eutsler asserts, the trial court ultimately based its decision to grant the motion to suppress on its conclusion that there had been an unreasonable seizure, not an unreasonable search; however, in determining that Eutsler had a sufficient interest in the hard drive, the trial court expressly found that he had such an interest to challenge a search. Specifically, in its December 31, 2018 letter opinion, the trial court finds that "Eutsler had a reasonable expectation of privacy to permit him to challenge the *search* of the [h]ard [d]rive." (Emphasis added). The trial court then expressly incorporated the rulings from the December 31, 2018 letter opinion into its order granting the motion to suppress.

We read the Commonwealth's first assignment of error as a challenge to this ruling. Because the language of the Commonwealth's assignment of error tracks the language of the trial court's ruling in this regard, the assignment of error complies with Rule 5A:12(c)(1)(ii)'s requirement that an assignment of error challenge a ruling of the trial court. Accordingly, Eutsler's challenge to the assignment of error is not well founded.

## II. Eutsler's Continued Interest in the Hard Drive

As noted above, the Commonwealth's first assignment of error challenges the trial court's conclusion that Eutsler maintained a sufficient interest in the hard drive to raise his Fourth Amendment claims. The Commonwealth argues that Eutsler forfeited any such interest by abandoning the hard drive and by effectively entrusting it to a third party, Bowling, who proved to be a "false friend."[8]

---

[8] In the trial court, the Commonwealth also argued that Eutsler had no cognizable Fourth Amendment interest in the hard drive because he, through the actions of Bowling, effectively consented to the search. The trial court rejected the consent argument, and the Commonwealth does not challenge the trial court's ruling in that regard. Accordingly, for the purpose of this appeal, it is conclusively established that Eutsler did not consent to either a search or a seizure of the hard drive.

A.  Abandonment

"A warrantless search or seizure of property that has been 'abandoned' does not violate the [F]ourth [A]mendment."  United States v. Thomas, 864 F.2d 843, 845 (D.C. Cir. 1989) (citing Abel v. United States, 362 U.S. 217, 241 (1960)).  "One who voluntarily abandons property forfeits any expectation of privacy he or she may have in it."  Holloway, 9 Va. App. at 18.  A person may abandon property for Fourth Amendment purposes without abandoning his ownership interest in it.  As we have observed,

> Abandonment in the context of the Fourth Amendment is different from the property law concept of abandonment.  A person may retain a property interest in personal property while, at the same time, relinquishing his or her reasonable expectation of privacy in that property.  A person's [i]ntent to retain a reasonable expectation of privacy determines whether the property has been abandoned . . . .

Id. (alteration in original) (internal quotation marks and citations omitted).

Here, the trial court determined that Eutsler had not voluntarily abandoned the hard drive.  We treat that determination as "a factual finding which, even when arguably mixed with questions of law, is subject to attack only if clearly erroneous."  Id. at 19.

Here, evidence in the record supports the trial court's finding that Eutsler did not *voluntarily* abandon the hard drive.  The evidence establishes that Eutsler never disclaimed his ownership interest in it, and, as the Commonwealth conceded at oral argument in this Court, there was no affirmative, voluntary act by Eutsler indicating he had no interest in the device.

Faced with this reality, the Commonwealth is left to argue that abandonment should be inferred from the fact that Eutsler left the hard drive at Dixie Oil and Gas, did not retrieve it before it came into the Department's possession, and failed to request that the Department return it to him thereafter.  We find this argument unpersuasive.

Although Eutsler did have the hard drive at Dixie Oil and Gas, he stored it not in a common area, but in his company vehicle or assigned office. See n.4, supra. Both the company vehicle and the office were owned by the company, but they were places over which Eutsler exercised some measure of dominion and control. It is true that Eutsler did not take the hard drive with him when he left Dixie Oil and Gas to go to the Department to be interviewed; however, the mere act of leaving something at one's workplace temporarily does not necessarily evince an intent to abandon that item. Eutsler reasonably may have expected that he would be able to retrieve the item shortly after he completed his interview at the Department.

He ultimately was denied that opportunity because he was arrested and jailed at the conclusion of his interview at the Department. He remained in jail until he was released on bond on December 19, 2016, meaning it was physically impossible for him to attempt to retrieve the hard drive during that time period. Moreover, once released from jail, he was served notice that he was banned from Dixie Oil and Gas property, meaning that, as the Commonwealth conceded at oral argument in this Court, it was legally impossible for him, acting alone, to recover the hard drive while it was still at Dixie Oil and Gas.

Despite these physical and legal impediments, Eutsler did attempt to regain possession of the hard drive, requesting that Bowling retrieve it for him. That this effort proved unsuccessful because Bowling ultimately did not retrieve the hard drive but rather started the process by which it came into the Department's possession does not alter the fact that, by seeking its recovery, Eutsler demonstrated a continuing interest in the hard drive. In short, ample evidence supports the trial court's conclusion that Eutsler did not abandon the hard drive, and therefore, we affirm that determination.

B. False Friend

The Commonwealth next argues that the trial court erred in concluding that Eutsler did not forfeit his Fourth Amendment interest in the hard drive when he enlisted a third party, Bowling, to retrieve it. In support of this argument, the Commonwealth cites Hoffa v. United States, 385 U.S. 293, 302 (1966), for the proposition that the Fourth Amendment does not protect a "wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it."

We acknowledge the "false friend" doctrine and its potential application to this case. The Commonwealth's argument raises interesting questions regarding the voluntariness of Eutsler's involvement of Bowling under the circumstances and whether any of Eutsler's actions amount to "reveal[ing] his wrongdoing" to Bowling or anyone else. Although intriguing, we need not answer these questions to resolve the appeal.

Unlike the abandonment issue, which goes directly to Eutsler's potential possessory interest underlying his unreasonable seizure claim, the Commonwealth's false friend argument primarily concerns privacy interests associated with searches as opposed to possessory interests. Cf. Segura, 468 U.S. at 806 (recognizing that seizures primarily implicate possessory interests while searches primarily implicate privacy interests). As such, we must address the abandonment issue to address the trial court's finding of an unreasonable seizure, but need not resolve the trial court's rejection of the Commonwealth's "false friend" argument.

Because resolving this argument is not necessary for us to resolve the appeal, we decline to do so. This is consistent with our charge to "decide cases 'on the best and narrowest grounds available.'" Commonwealth v. White, 293 Va. 411, 419 (2017) (quoting Commonwealth v. Swann, 290 Va. 194, 196 (2015)). Accordingly, we assume, but do not decide, that the trial court did not err in rejecting the Commonwealth's "false friend" argument.

III. Passage of Time as Unreasonable Seizure

Unlike most unreasonable seizure claims, the claim Eutsler raised in the trial court and that we confront on appeal does not challenge law enforcement's acquisition of his property. To the contrary, the trial court found and Eutsler does not challenge that the Department's acquisition of the hard drive did not constitute a seizure in violation of the Fourth Amendment. Rather, Eutsler argues and the trial court found that the Department's legal acquisition of the hard drive became an unreasonable seizure only when the Department held it for a period of more than forty days without taking any investigative action regarding the hard drive. It appears that no Virginia appellate court has addressed this issue.

Although the issue before us is one of first impression, we apply a familiar standard in conducting our review. "[W]e are bound by the trial court's findings of historical fact unless plainly wrong[] and . . . give due weight to the inferences drawn from those facts by the trial judge[,]" Salahuddin v. Commonwealth, 67 Va. App. 190, 202 (2017) (internal quotation marks and citation omitted), but we "consider *de novo* whether those facts implicate the Fourth Amendment[,]" Pharr v. Commonwealth, 50 Va. App. 89, 95 (2007). Accordingly, in conducting our review, we defer to the trial court's findings of fact, but not its conclusion that the delay in seeking a warrant converted the Department's lawful possession of the hard drive into an unreasonable seizure.

The United States Supreme Court has recognized that "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" United States v. Jacobsen, 466 U.S. 109, 124 (1984). Because a person generally retains at least some possessory interest in items seized by authorities, a lack of diligence by authorities that unnecessarily lengthens the time period in which a person is denied

his possessory interest in an object lawfully seized can convert that lawful seizure into an unreasonable one. United States v. Place, 462 U.S. 696, 709 (1983).

Because questions of "reasonableness[,]" Brigham City, 547 U.S. at 403, are not conducive to drawing bright lines, we are unable to craft "a *per se* rule of unreasonableness[,]" Illinois v. McArthur, 531 U.S. 326, 331 (2001), to address this situation. Rather, we must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Place, 462 U.S. at 703; see also United States v. Pratt, 915 F.3d 266, 271 (4th Cir. 2019) ("To determine if an extended seizure violates the Fourth Amendment, we balance the government's interest in the seizure against the individual's possessory interest in the object seized."). Balancing these competing interests necessarily is a fact-specific enterprise, and "[t]hus, when determining whether a delay renders a seizure unreasonable under the Fourth Amendment, we evaluate the totality of the circumstances presented by each case." United States v. Laist, 702 F.3d 608, 613 (11th Cir. 2012); see also United States v. Mitchell, 565 F.3d 1347, 1351 (11th Cir. 2009) ("The reasonableness of the delay is determined 'in light of all the facts and circumstances,' and 'on a case-by-case basis.'" (quoting United States v. Mayomi, 873 F.2d 1049, 1054 n.6 (7th Cir. 1989))).

Courts confronted with this fact-intensive question "have identified several factors highly relevant to this inquiry[.]" Laist, 702 F.3d at 613. As summarized by the court in Laist, relevant factors include "the significance of the interference with the person's possessory interest; . . . the duration of the delay; whether or not the person consented to the seizure; and . . . the government's legitimate interest in holding the property as evidence." Id. at 613-14 (citations omitted). The Laist court also recognized that the type of property seized is a relevant factor with computers and similar devices being entitled to special solicitude because they "are relied

upon heavily for personal and business use. Individuals may store personal letters, e-mails, financial information, passwords, family photos, and countless other items of a personal nature in electronic form on their computer hard drives." Id. at 614.

Although the Laist list is non-exhaustive and any fact that is material to determining whether the length of the seizure is reasonable must be considered, the list provides, at a minimum, a reasonable place to begin the analysis. While there may be others, these factors likely will be significant in many if not all cases where the issue is whether the elongation of a lawful seizure of property renders the seizure unreasonable. As a result, we apply these factors to the instant case.

It is undisputed that Eutsler did not consent to the seizure of his hard drive. Similarly, it is undisputed that the hard drive, like a computer or cell phone, is an object entitled to special solicitude because of the vast amounts of personal information it could contain. Id.; cf. Riley, 573 U.S. at 393-97 (recognizing that, because of its storage capacity and the types of information it can contain, cell phones are different than other objects normally carried on one's person, and therefore, raise additional Fourth Amendment interests and concerns). Accordingly, these two factors weigh in favor of Eutsler.

The more than forty-day delay in police seeking a search warrant also tips the balance towards Eutsler. The only reason offered for the delay was that the Department faced a manpower shortage because it was simultaneously conducting an active homicide investigation and a homicide "cold case" was "heating up" in some undefined way. Although a delay in seeking a search warrant may be explained by competing demands on limited police resources, see, e.g., Mitchell, 565 F.3d at 1353 (recognizing that "circumstances [may] arise, necessitating the diversion of law enforcement personnel to another case" and "that there may be occasions where the resources of law enforcement are simply overwhelmed . . . so that a delay that might

- 22 -

otherwise be unduly long would be regarded as reasonable"), the trial court rejected the Department's manpower excuse in this case.

After all, even assuming that most of the Department's attention was focused on other cases, the amount of time it would have taken to seek a warrant would not have been significant. Given that the warrant application was essentially a duplicate of the prior warrant application regarding the previously seized and searched cell phone with only a mere paragraph added regarding the hard drive, it is hard to imagine that it took even one of the nearly 1,000 hours the Department possessed the hard drive to draft the warrant application and present it to a magistrate. Furthermore, it is important to remember that obtaining the warrant effectively ended the Department's investigation related to the hard drive because the forensic analysis of the hard drive was not conducted by the Department, but rather, was conducted by the computer crimes unit at the Office of the Attorney General. Nothing in the record indicates that the computer crimes unit was suffering from any manpower issues, and, as the Commonwealth conceded at oral argument, the record reflects that the unit was able to take possession and begin its analysis of the hard drive within twenty-four hours of the warrant being obtained. In short, the trial court reasonably rejected the Department's manpower excuse as a reasonable explanation for the more than forty-day delay.

When viewed to the exclusion of other facts and circumstances, these three factors favor Eutsler, but they are not dispositive. They must be balanced against other significant factors, including the extent of Eutsler's possessory interest in the hard drive and the extent of law enforcement interests. Properly viewed, these factors swing the balance in favor of the Commonwealth.

Eutsler correctly notes that inherent in the trial court's finding that he had not abandoned the hard drive is a finding that he continued to have a possessory interest in it. We agree.

- 23 -

However, such a finding is not a finding that the person has an unfettered right of possession. The trial court recognized as much when it stated that its abandonment ruling "does not end the inquiry into the merits of the [m]otion [to suppress]; rather, it only ensures that Eutsler may now proceed with it."[9]

Although, as owner of the hard drive, Eutsler maintained at least some possessory interest in it, the facts found below make clear that his possessory interest was far from unfettered. Obviously, the hard drive was not in his physical possession; in divesting himself of physical possession, Eutsler did not leave the hard drive in a place, such as his home, that would give rise to additional protection of his possessory interest, but rather, left it at or in property belonging to Dixie Oil and Gas. Thus, it was exposed to others, reducing his possessory interest. His possessory interest was further diminished because, crediting Eutsler's testimony, he was not even certain where the hard drive was, stating it was *either* in his company vehicle *or* in his company office.

Eutsler's arrest and incarceration further reduced his possessory interest in the hard drive. While he was jailed, it was physically impossible for Eutsler to retrieve the hard drive and, even if he could have retrieved it, he would have been unable to use it while in jail. See, e.g., United States v. Sullivan, 797 F.3d 623, 633 (9th Cir. 2015) ("Where individuals are incarcerated and

---

[9] Eutsler notes that in footnote six of its September 10, 2019 letter opinion, the trial court noted that it had "found in its Opinion Letter dated 12/31/18 that [Eutsler] retained his reasonable expectation of privacy; therefore, his possessory interest[s] were not diminished." Eutsler characterizes the statement as an unappealed finding of fact that binds us on appeal. In this, he commits a category error. Although the question of whether a person has an item in his possession at a given moment is undeniably a question of fact, resolution of a question regarding the extent of the Fourth Amendment possessory interest that a person maintains in an object not in his physical control requires the application of legal principles. Accordingly, it presents, at a minimum, a mixed question of law and fact subject to *de novo* review in this Court. See Pharr, 50 Va. App. at 95.

- 24 -

cannot make use of seized property, their possessory interest in that property is reduced." (citing

Segura, 468 U.S. at 813)).

His possessory interest remained reduced even upon his release from jail. Having been

banned from the property of Dixie Oil and Gas, what had been physically impossible remained

legally impossible because Eutsler could not enter company property to retrieve the hard drive.

Underscoring his diminished possessory interest, he had to enlist a third-party, Bowling, to try to

retrieve it. Thus, by definition, he was unable to exercise exclusive possession over his property,

the high-water mark of any incident of possession.[10]

Eutsler's possessory interest was further reduced by the fact that his claim to possession

of the hard drive represented a claim to possess *known* contraband. As such, his possessory

claim was, at least in part,[11] a claim to possess something that "no individual has any right to

possess[.]" Illinois v. Caballes, 543 U.S. 405, 410 (2005). Because he had no legal right to

possess the known child pornography, Eutsler definitionally had a diminished possessory interest

---

[10] In the proceedings below and on appeal, the Commonwealth argues that, even if it had been returned to him upon his release from jail, Eutsler would have been unable to use the hard drive because the conditions of his bail precluded his use of computers. However, the record contains no evidence that such a condition was in place from Eutsler's release from jail on December 19, 2016 through February 7, 2017, when the Commonwealth obtained the search warrant. The only evidence of any such condition is contained in a bond recognizance dated October 9, 2018. Noting that he was not jailed for these offenses during the relevant time period, but rather, was jailed until December 19, 2016, for child pornography charges in another case related to his cell phone, Eutsler filed a motion requesting that we take judicial notice of the December 19, 2016 bond recognizance, which does not contain a ban on computer use, that he claims was in effect in the relevant period. Because documents from another case that were not presented to the trial court are not part of the record in this case, we deny Eutsler's motion. See Rule 5A:7. Nevertheless, there is no evidence that Eutsler was barred from using a computer during the relevant time period, and therefore, we have not considered that as a basis for our opinion.

[11] Eutsler stresses that the hard drive contained things other than child pornography, and thus, contained things other than contraband. We note however that it was Eutsler that elected to store these other things on the same hard drive on which he stored the contraband, which necessarily lessened his possessory interest in the hard drive. Furthermore, Eutsler did not seek the return of the non-contraband items during the relevant time period.

in it.  Furthermore, because contraband is, in a very real sense, the crime itself, the interests of law enforcement are at their apex in situations of known contraband.

It is important to recognize what we mean by "known contraband" in this context.  We do not use the phrase to indicate that everyone knows that child pornography is illegal, and thus, constitutes contraband.  That meaning, while true, would add little to our reasonableness analysis.  Rather, we use the phrase in the context of the trial court's unappealed, factual finding that the Department knew the hard drive contained child pornography when they came into possession of the hard drive.[12]

This finding distinguishes this case from situations where police merely suspect that a cell phone, computer, or container contains contraband.  Unlike the status of Schrödinger's theoretical cat,[13] here the Department knew, as opposed to suspected or believed, that the hard

---

[12] In this Court, Eutsler argues that investigators did not truly "know" the hard drive contained child pornography when they obtained the hard drive; however, the state of knowledge of the Department at a particular time is unquestionably a question of fact and Eutsler did not challenge that finding on appeal.  Accordingly, that finding is binding upon us.  Furthermore, on the same day that the Department gained possession of the hard drive, Cason viewed some of its contents and confirmed that it contained child pornography, meaning that the Department knew it contained child pornography for the forty-one-day period at issue.  We recognize that Eutsler challenged Cason's initial search in the proceedings below, but the trial court expressly declined to rule on that issue, and therefore, the legality of that search is not before us in the present appeal.  Accordingly, we express no opinion on the legality of Cason's initial, confirmatory search.

[13] "Schrödinger's cat" refers to a thought experiment constructed by physicist Erwin Schrödinger to illustrate an issue with the Copenhagen interpretation of quantum mechanics. The basics of the thought experiment involve a cat being kept in a sealed box with a vial of poison.  The vial will degrade over time, eventually causing the death of the cat.  However, without knowing precisely when the vial will break and release the poison, there is no way to know if the cat is dead or alive at any given point without opening the box.  Thus, the cat can be thought of as both alive and dead.  A hard drive is similar to the box.  Without accessing its contents, it can be thought of as potentially containing contraband/evidence of crimes and not containing such things.  Here, given the trial court's factual finding of knowledge, the box had been opened and the Department knew the fate of the cat.  A case where the Department lacked such knowledge is a different case.

drive contained contraband. Such knowledge represents a distinction with a difference and is central to our resolution of this appeal.

In addition to stating that no person may possess contraband lawfully, id., the United States Supreme Court has recognized that authorities knowing a container contains contraband reduces a person's Fourth Amendment interests in that container. See, e.g., Illinois v. Andreas, 463 U.S. 765, 771-72 (1983). Applying that principle to cases involving delays in seeking search warrants for property lawfully seized, courts have found that such knowledge significantly undermines a person's possessory interest. See, e.g., Laist, 702 F.3d at 616 (finding that Laist's admission to FBI agents that the computer contained child pornography coupled with agent's observation of same "both diminishes Laist's interest further while also enhancing the government's legitimate interest in maintaining custody of the computer and hard drives as substantial evidence of a serious federal crime"); United States v. Sparks, 806 F.3d 1323, 1339 (11th Cir. 2015) (recognizing that agent's actual knowledge that cell phone contained child pornography reduced defendant's possessory interest in the cell phone); United States v. Shaw, 531 F. App'x 946, 949 (11th Cir. 2013) (recognizing that agent's actual knowledge that cell phone contained evidence of crimes reduced defendant's possessory interest in the cell phone).

Recognizing that these cases turn on their specific facts, we find significant parallels between the instant case and Sparks. Although the Eleventh Circuit ultimately upheld the trial court's abandonment finding, prior to doing so, it detailed a list of facts that led it to conclude that the defendants had a reduced possessory interest in the cell phone at issue. Specifically, the court noted that the defendants'

> possessory interests in the phone were "greatly diminished" for a number of reasons: (1) the phone had been lost and retrieved by a private person; (2) the phone was not password protected; (3) two private citizens and several law-enforcement officials had already viewed images contained on the phone; (4) from that point forward, neither defendant would have been able to retrieve the

phone because it contained contraband and was itself derivative contraband; and (5) the defendants replaced the cell phone within a couple of days. Based on the weighing of these factors, the court concluded that the government's legitimate interest in holding the cell phone that it had already determined contained contraband outweighed [defendants'] interests in the phone.

Sparks, 806 F.3d at 1339.

To one degree or another, almost all of these facts are present here. Although Eutsler did not "lose" the hard drive, he did not know its exact location, had left it on property belonging to another, and required a third-party's assistance to retrieve the hard drive, which was not password protected. As in Sparks, the third-party, despite agreeing to return the hard drive, did not do so, but rather, viewed its illicit contents and shared his discovery with others, ultimately including law enforcement. Like the agents in Sparks, from the time the Department first possessed the hard drive, it knew that it contained contraband.

All of these factors lead us to conclude that despite his unquestioned ownership interest, Eutsler's possessory interest in the hard drive was greatly diminished and law enforcement's interest was at its apex. Simply put, the Department could not return the hard drive containing contraband to Eutsler. If deputies had done so, they would have known that they were witnessing his possession of child pornography, one of the very crimes for which he is now charged.

This leads us to conclude that, despite some of the factors favoring Eutsler, the Department's continued possession of the hard drive ultimately was reasonable for Fourth Amendment purposes. Accordingly, the trial court erred in suppressing the evidence on the grounds of the Department's delay in seeking a warrant, and we remand the case to the trial court for further proceedings consistent with this opinion.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court that Eutsler did not abandon the hard drive, but we reverse the trial court's judgment that the delay in seeking a search warrant converted the Department's lawful acquisition of the hard drive to an unreasonable seizure requiring suppression of the hard drive and the evidence contained thereon. Accordingly, we remand the case to the trial court for further proceedings consistent with this opinion.

<u>Affirmed in part, reversed in part, and remanded.</u>