# Norfolk

JOHN CURTIS GREENE

v.

COMMONWEALTH OF VIRGINIA

No. 0108-92-1

Decided February 1, 1994

Counsel

James O. Broccoletti (William M. McKee; Zoby & Broccoletti, P.C., on briefs), for appellant.

Virginia B. Theisen, Assistant Attorney General (Stephen D. Rosenthal, Attorney General, on brief), for appellee.

Opinion

**BRAY, J.**—John Curtis Greene (defendant) was convicted of possession of cocaine with intent to distribute. Defendant argues (1) that the trial court erred in refusing to suppress evidence discovered as a result of an unlawful seizure, and (2) that the evidence was insufficient to support the conviction. We disagree and affirm the judgment of the trial court.

In accordance with well established principles, we assess the sufficiency of the evidence to support a criminal conviction upon a review of the record "in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. The judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict and will not be set aside unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it." *Martin v. Commonwealth,* 4 Va. App. 438, 443,

358 S.E.2d 415, 418 (1987) (citing Code § 8.01-680). "The weight which should be given to evidence and whether the testimony of a witness is credible are questions which the fact finder must decide." *Bridgeman v. Commonwealth*, 3 Va. App. 523, 528, 351 S.E.2d 598, 601 (1986).

Similarly, in considering a trial court's ruling on a suppression motion, we view the evidence in the "light most favorable to . . . the prevailing party below," the Commonwealth in this instance, and the decision of the trial judge will be disturbed only if plainly wrong. *Commonwealth v. Grimstead*, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). Our review of the record includes evidence adduced at both the trial and the suppression hearing. *DePriest v. Commonwealth*, 4 Va. App. 577, 583, 359 S.E.2d 540, 542-43 (1987), *cert. denied*, 488 U.S. 985 (1988). To prevail on appeal, the defendant must "show . . . that the denial of [his] motion . . . constitute[d] reversible error." *Motley v. Commonwealth*, 17 Va. App. 439, 440-41, 437 S.E.2d 232, 233 (1993).

On September 28, 1990, Officer S. Mills, Special Agents Craig Wiesner and Wilbur Ladison, Investigator Earl Killmon and Trooper Powers were assigned to a "Drug Interdiction Team" at the Norfolk International Airport. All were dressed in "casual street clothes" and did not display their weapons. At approximately 10:15 a.m., Mills, Wiesner and Ladison observed passengers deplane a flight from New York, a city described by Mills as "one of the primary sources for narcotics." When defendant passed through the "jetway," Mills noticed an "unnatural bulge in the crotch area" of defendant's trousers, "maybe the size of a tennis ball."

Mills "motioned to the others . . . as to what [he] had observed" and followed defendant into the restroom. Although defendant closed himself in a "stall," he did not use the "facilities" and exited shortly thereafter. After speaking with someone from a public phone, defendant took a seat at "one of the gates" and appeared to "nap." While Agent Ladison and Investigator Killmon waited at a nearby gate, Mills and Wiesner approached defendant. With Mills "directly to [defendant's] side" and Agent Wiesner standing "five or six feet" to Mills' right, Mills initiated contact with the defendant, saying, "Excuse me, sir, can I talk with you?"

After defendant agreed to speak with Mills, Mills inquired "if he just flew from La Guardia." When defendant answered "no," Mills

displayed his "DEA credentials," and defendant "arose" to examine them. Mills then questioned defendant's identity and travel plans and requested that he produce his airline ticket. While complying, defendant remarked that he "felt [his] rights were being violated" and asked Mills, "What is the problem?" Mills explained that "[they] were narcotics officers . . . attempting to stem the flow of narcotics into the area." When defendant again complained that "his rights were being violated," Mills reminded him that he had consented to speak with the officers but asked defendant no further questions. Mills testified that defendant was free to "walk away . . . at that point in time."

Defendant then "requested" access to a nearby pay telephone, and Mills "moved away" to allow defendant unrestricted "passage." While defendant used the phone, Mills and Wiesner stood "[p]robably ten, fifteen feet" distant, and Ladison was "20 to 30 yards" away. During the telephone conversation, Killmon and Ladison joined Mills and advised him that defendant had flown from Atlanta to La Guardia the previous day, had "just" arrived from La Guardia and was ticketed for return to Atlanta. Killmon added that defendant "had some baggage claim stubs attached to his ticket."

As the officers discussed this information, Mills heard the "phone slam down," "looked" and saw "something," which "appeared to be white," in defendant's "crotch area where he was unzipping his pants." Defendant then ran toward the restroom, and Mills "gave chase." Weisner was also "right on [defendant's] heels" and pursued him into the first stall. There, defendant "dropped to his knees, . . . pulled something from his crotch area . . . and tried shoving it up the commode and flushing the commode with his other hand in the process." Weisner suspected that the material was cocaine, and a struggle ensued as the officers attempted to retrieve it and take defendant into custody. Investigator Killmon testified that during the tussle, defendant stated that "he ran . . . because he wanted to get rid of the dope."

Once defendant was in custody, Killmon remained in the restroom until the toilet was removed "from the wall," and he recovered a plastic package containing a white powder, later determined to be cocaine, from "the trap." The package was "probably two to three inches thick, . . . five inches long, [and] maybe three and-a-half to four inches wide."

Defendant first argues that he was "seized in his person" from the inception of the encounter by oppressive and coercive police conduct

in violation of the fourth amendment. He asserts that "the facts reveal a sinister and manipulative psychological game," during which the officers "controlled" him "under circumstances such that he reasonably thought he was not free to leave." Because this unlawful seizure preceded defendant's flight and subsequent discovery of the cocaine, he urges that the evidence "be suppressed as . . . the product of illegal police conduct."

The constitutional guarantee which defendant invokes secures citizens in their persons and property against unreasonable seizures. *Baldwin v. Commonwealth*, 243 Va. 191, 195, 413 S.E.2d 645, 647 (1992). However,

> [t]he purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

*United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980) (citation omitted). Thus, a consensual encounter between police and an individual has no fourth amendment implications unless accompanied by such "coercion or show of force or authority by the officer . . . that would cause a person . . . reasonably to have believed that he or she was required to comply" and "not free to leave." *Commonwealth v. Satchell*, 15 Va. App. 127, 131, 422 S.E.2d 412, 414 (1992); *Motley*, 17 Va. App. at 442, 437 S.E.2d at 234. Acquiescence in "a police request, which most citizens will do, does not negate 'the consensual nature of the response.'" *Grinton v. Commonwealth*, 14 Va. App. 846, 849, 419 S.E.2d 860, 862 (1992) (quoting *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984)); *see Baldwin*, 243 Va. at 197, 413 S.E.2d at 648.

Contrary to defendant's contention, a seizure does not occur whenever an individual senses that police activity has restrained his liberty but occurs "only if, in view of all of the circumstances surrounding the incident, a *reasonable person* would have believed that

he was not free to leave."[1] *Mendenhall*, 446 U.S. at 554 (emphasis added); *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). This objective standard "look[s] to the reasonable man's interpretation of the conduct in question," thus "ensur[ing] that the scope of the Fourth Amendment protection does not vary with the state of mind of the particular individual being approached." *Chesternut*, 486 U.S. at 574.

We have acknowledged that the "*Mendenhall* test 'is necessarily imprecise' and 'flexible' " in order to accommodate " 'consistent application from one police encounter to the next,' " irrespective of individualized reactions. *Satchell*, 15 Va. App. at 130, 422 S.E.2d at 414 (quoting *Chesternut*, 486 U.S. at 573-74). It "involves factual determinations" by the trial court "which bear upon whether a reasonably prudent person would feel that he or she is not free to leave." *Satchell*, 15 Va. App. at 130, 422 S.E.2d at 414.

In overruling defendant's motion to suppress, the trial judge noted:

I think that [defendant] was free to leave anytime he wanted to . . . . He panicked. He ran. They had a right to follow him . . . . I don't think that [the officers] did anything that a reasonable person wouldn't expect . . . . A reasonable person out traveling expects to go through the meters that check whether or not you've got weapons. A reasonable person expects when you go through there they will say, May I look at your ticket? I think a reasonable person expects that . . . . *And I don't think that his rights were violated.* They had a right to talk with him. They didn't harass him, and if he hadn't panicked, you [defense counsel] and I wouldn't be here. (emphasis added).

These conclusions are clearly supported by the record. Officer Mills engaged defendant in "consensual" conversation in an open, public place, free of threat or intimidation. Only two officers approached defendant; no uniforms or weapons were displayed and defendant was treated courteously. He was not touched, detained or threatened during the encounter. Though several agents were in the vicinity while defendant spoke over the phone, their presence suggest-

---

[1] "Circumstances to be considered in determining whether a reasonable person would have believed that he was not free to leave include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' " *Satchell*, 15 Va. App. at 131, 422 S.E.2d at 414-15 (quoting *Mendenhall*, 446 U.S. at 554).

ed only a possible interest in further conversation with him. Such circumstances would not communicate restraint or coercion to a reasonable person.[2]

Although defendant was surely "seized" in the men's room, it is well established that

[a] law enforcement officer may lawfully arrest, without a warrant, for a felony or upon "reasonable suspicion" that a felony has been committed by the arrested person.

The test of constitutional validity is whether at the moment of arrest the arresting officer had knowledge of sufficient facts and circumstances to warrant a reasonable man in believing that an offense has been committed.

*Bryson v. Commonwealth*, 211 Va. 85, 86-87, 175 S.E.2d 248, 250 (1970) (citations omitted); *see also* Code § 19.2-81. Defendant arrived on a flight from a city reputed to be a source of narcotics with an "unnatural bulge" in the crotch of his pants. He proceeded immediately to the privacy of a closed stall in an airport restroom but did not otherwise use the facilities. He was untruthful during the initial encounter with Officer Mills. Later, and after learning that the police were narcotics agents, defendant abruptly dropped the telephone, and a white material was observed hidden in the unzipped crotch area of his pants as he raced to a nearby restroom. Once again in a stall, defendant dropped to his knees and frantically attempted to discard suspected cocaine into the toilet. These facts presented an array of circumstances sufficient to provide trained law enforcement officers with probable cause to arrest defendant. *See DePriest*, 4 Va. App. at 584-85, 359 S.E.2d at 543-44.

Defendant's contention that the evidence failed to establish a "sufficient nexus" between the article "flushed" by him and the cocaine "found in the toilet plumbing" is also without merit. During the struggle at the time of arrest, defendant confessed "that the only reason he ran was because he wanted to get rid of the dope." Moreover, as the trial judge noted, "[t]he agent saw [the package of cocaine] come out of the crotch and into the toilet. He retrieved it from the toilet and he got it. . . . This is five or six thousand dollars of cocaine. Most people don't flush this down the toilet unless they [have] . . . the police hot on their tail." The inference that the cocaine recovered by the po-

---

[2] Moreover, defendant was not "seized" when agents followed as he raced to the restroom. *See California v. Hodari D.*, 499 U.S. 621, 625-26 (1991).

lice was previously possessed by defendant naturally and reasonably flows from the circumstances.

Defendant, therefore, was not wrongfully seized, and the evidence was sufficient to support the conviction. Accordingly, we affirm the judgment of the trial court.

*Affirmed.*

Baker, J., and Coleman, J., concurred.