455 S.E.2d 744

**Brian WECHSLER, S/K/A Brian Weschler**

v.

**COMMONWEALTH of Virginia.**

**Record No. 1661–93–4.**

Court of Appeals of Virginia,
Alexandria.

April 11, 1995.

164

John Kenneth Zwerling, Alexandria (Kyle W. O'Dowd; Moffitt, Zwerling & Kemler, on briefs), for appellant.

H. Elizabeth Shaffer, Asst. Atty. Gen. (James S. Gilmore, III, Atty. Gen., on brief), for appellee.

Present: WILLIS, BRAY and FITZPATRICK, JJ.

BRAY, Judge.

Brian Wechsler (defendant) entered conditional guilty pleas to indictments charging possession of "more than" five pounds of marijuana with the intent to distribute and the transportation of "more than" five pounds of marijuana into the Commonwealth with the intent to distribute. On appeal, defendant complains that the trial court erroneously overruled his motion to suppress the offending drugs discovered during a seizure of his person and search of his property. We disagree and affirm the convictions.

In reviewing a trial court's ruling on a suppression motion, we consider the evidence in the "light most favorable to ... the prevailing party below," the Commonwealth in this instance, and the decision will be disturbed only if plainly wrong. *Commonwealth v. Grimstead,* 12 Va.App. 1066, 1067, 407 S.E.2d 47, 48 (1991). "It is well established that, on appeal, appellant carries the burden to show ... that the denial of a motion to suppress constitutes reversible error." *Motley v. Commonwealth,* 17 Va.App. 439, 440–41, 437 S.E.2d 232, 233 (1993) (citing *Fore v. Commonwealth,* 220 Va. 1007, 1010, 265 S.E.2d 729, 731, *cert. denied,* 449 U.S. 1017, 101 S.Ct. 579, 66 L.Ed.2d 477 (1980)). Our review of the record includes evidence adduced at both the suppression hearing and trial. *Greene v. Commonwealth,* 17 Va.App. 606, 608, 440 S.E.2d 138, 139 (1994).

On the morning of November 13, 1992, Jim Hughes, a "drug agent" assigned to the Dallas/Fort Worth, Texas airport, notified Douglas Kahn, a Drug Enforcement Administration agent interdicting narcotics at Washington National Airport, that a "confidential informant" had advised him that an indi-

vidual identified as Brian Wechsler was in flight to Washington National, from Tucson, Arizona, through Dallas/Fort Worth, "possibly carrying narcotics." Wechsler had reserved a one-way ticket only an hour before departure, arrived at the Tucson terminal just prior to "take off," paid cash and "checked" two bags. Hughes provided Kahn with Wechsler's description and his flight and baggage claim numbers. He also reported that a person matching Wechsler's description was in the Dallas/Fort Worth airport, "acting very nervous."

Without objection, Kahn qualified in the trial court as "an expert in narcotics and drug transportation and methodology at the airport and generally." He testified that "drug couriers typically will pay cash for a ... ticket and check in at the last minute to board flights." Based upon this experience and the information provided by Hughes, Kahn initiated an investigation and, accompanied by agents Jacobsen and Shelley, proceeded immediately to National Airport.

While Agent Shelley located Wechsler's "checked" luggage, Agents Jacobsen and Kahn stationed themselves at the gate disembarking passengers from Wechsler's flight. Defendant, fitting the description of Wechsler, *carrying* two bags, deplaned into the concourse, looked "right at" the agents, and "put his head down very quickly." He then walked with other passengers to the baggage claim area and stopped approximately ten to fifteen feet from and "facing" the luggage carousel unloading bags from the flight. After approximately five minutes, defendant had "eye contact" with Kahn and Jacobsen and stepped to a nearby pay telephone. He appeared to "dial a number," but apparently spoke with no one and "shortly" exited the terminal building, without returning to the baggage carousel.

As defendant was about to enter a taxi cab, Agent Kahn displayed his badge, identified himself, and "asked if he would mind answering a few questions." Kahn advised defendant that he was free to leave and not under arrest. Defendant agreed to speak with the agents and, at Kahn's request, "moved over a little bit" to the sidewalk adjoining the cab

stand. In response to Kahn's inquiries, defendant produced proper identification and confirmed his recent arrival from Tucson. However, he claimed that he "threw his ticket away" and denied that he had "checked" any baggage or used the telephone. When Kahn explained that he was investigating the movement of narcotics and large sums of cash into the Washington area, defendant denied any involvement and consented to a search of the two bags in his immediate possession.

In one bag, Kahn discovered a package containing a "green substance," labeled "Smoking Herb," which he suspected was marijuana.[1] Almost simultaneously, Jacobsen located defendant's airline and baggage claim tickets in the remaining bag. When Jacobsen reminded defendant of his earlier statements, Wechsler replied, "I thought I threw [the plane ticket] away," "I guess I have luggage then." Defendant then protested that he "wanted to leave," but was detained and "asked" by Kahn to accompany the agents to the "police substation" in the terminal building. As the trio walked to the substation, defendant told Jacobsen, "I don't have any luggage with me," or "I don't have any luggage."

The investigation was delayed at the substation approximately thirty-five minutes while Kahn spoke with the U.S. Attorney by telephone and a "dog unit" reported to the airport. Shelley then brought the two "checked" bags, tagged with defendant's claim tickets, into the substation. The locked luggage was opened by keys found with the carry-on bags, twenty-five pounds of marijuana was discovered, and defendant was arrested for the subject offenses.

In overruling defendant's motion to suppress the drugs, the trial court found that defendant had "ID'd" the agents in the airport terminal, "knew they were looking for him," and that "he had a problem with [the] luggage," and "got [the] cab to get out of there." The court concluded that this conduct

---

1. This substance later "field tested" negative for marijuana.

combined with defendant's denials of ownership to manifest abandonment of the luggage.

## THE SEIZURE

Defendant first contends that he was unconstitutionally seized by Kahn's oppressive conduct at the inception of the encounter, and, therefore, all evidence attributable to this unlawful restraint must be suppressed.

■ Fourth Amendment jurisprudence recognizes three categories of police-citizen confrontations: (1) consensual encounters, (2) brief, minimally intrusive investigatory detentions, based upon specific, articulable facts, commonly referred to as *Terry* stops, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and (3) highly intrusive arrests and searches founded on probable cause. *Payne v. Commonwealth*, 14 Va.App. 86, 88, 414 S.E.2d 869, 869–70 (1992); *Iglesias v. Commonwealth*, 7 Va.App. 93, 99, 372 S.E.2d 170, 173 (1988) (en banc).

A "consensual encounter between police and an individual has no fourth amendment implications unless accompanied by such 'coercion or show of force or authority by the officer ... that would cause a person ... reasonably to have believed that he or she was required to comply' and 'not free to leave.' " *Greene*, 17 Va.App. at 610, 440 S.E.2d at 140 (quoting *Commonwealth v. Satchell*, 15 Va.App. 127, 131, 422 S.E.2d 412, 414 (1992)). This principle acknowledges that

> [t]he purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

*United States v. Mendenhall*, 446 U.S. 544, 553–54, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (citation omitted).

■ Cooperation with police and "[a]cquiescence in 'a police request, which most citizens will do, does not negate "the consensual nature of the response." ' " *Greene,* 17 Va. App. at 610, 440 S.E.2d at 140–41 (citations omitted). A voluntary police-citizen encounter becomes a seizure for Fourth Amendment purposes "only if, in view of all of the circumstances ... a *reasonable person* would have believed that he was not free to leave." *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (emphasis added); *see also Baldwin v. Commonwealth,* 243 Va. 191, 196, 413 S.E.2d 645, 647–48 (1992); *Greene,* 17 Va.App. at 610–11, 440 S.E.2d at 141. This objective standard "ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached." *Michigan v. Chesternut,* 486 U.S. 567, 574, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); *see also Greene,* 17 Va.App. at 611, 440 S.E.2d at 141. It requires "factual determinations" by the trial court "that bear upon" the perceptions of a similarly situated "reasonably prudent person." *Commonwealth v. Satchell,* 15 Va.App. 127, 130, 422 S.E.2d 412, 414 (1992).

■ In contrast, even a brief detention for investigative purposes constitutes a seizure contemplated by the Fourth Amendment. *See Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). "In order to justify such a seizure, an officer must have a 'reasonable and articulable suspicion of criminal activity on the part of the defendant. . . .' A general suspicion of some criminal activity is enough, as long as the officer can, based on the circumstances before him ... articulate a reasonable basis for his suspicion." *Hatcher v. Commonwealth,* 14 Va.App. 487, 490, 419 S.E.2d 256, 258 (1992) (citations omitted). "[W]hen a court reviews whether an officer had reasonable suspicion to make an investigatory stop, it must view the totality of the circumstances ... objectively through the eyes of a reasonable police officer with the knowledge, training, and experience of the investigating officer." *Murphy v. Commonwealth,* 9 Va.App. 139, 144, 384 S.E.2d 125, 128 (1989) (citation omitted).

 Armed with the requisite suspicion, an officer may stop a person " 'in order to identify him, to question him briefly, or to detain him briefly, while attempting to obtain additional information.' " *DePriest v. Commonwealth,* 4 Va. App. 577, 585, 359 S.E.2d 540, 544 (1987), *cert. denied,* 488 U.S. 985, 109 S.Ct. 541, 102 L.Ed.2d 571 (1988) (quoting *Hayes v. Florida,* 470 U.S. 811, 816, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705 (1985)). However, police procedures and investigative methods attendant to the detention must be calculated to confirm or dispel the suspicion quickly and with minimal intrusion. *Thomas v. Commonwealth,* 16 Va.App. 851, 856–57, 434 S.E.2d 319, 323 (1993). While a " 'bright line rule would be desirable, in evaluating whether [the] investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.' " *Limonja v. Commonwealth,* 8 Va.App. 532, 542, 383 S.E.2d 476, 482 (1989) (en banc) (citation omitted), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1925, 109 L.Ed.2d 288 (1990). Thus, the level and duration of detention must be assessed in the context of each case and the related police conduct judged accordingly. *See, e.g., Thomas,* 16 Va.App. at 856–57, 434 S.E.2d at 323; *Limonja,* 8 Va.App. at 542, 383 S.E.2d at 482; *DePriest,* 4 Va.App. at 587, 359 S.E.2d at 545.

 Here, the initial encounter between defendant and the officers was clearly consensual. Defendant was approached during daylight hours in a busy, public place as he prepared to enter a taxi. The agents were not in uniform, displayed no weapons, did not touch defendant, did not speak harshly or otherwise threaten or intimidate him. After Kahn's initial contact with defendant, defendant agreed to converse with the agents, and was advised that he was free to leave and not under arrest. Such circumstances "would not communicate restraint or coercion to a reasonable person." *Greene,* 17 Va.App. at 612, 440 S.E.2d at 141 (footnote omitted).

 Defendant did not indicate that he wished to end the encounter until the consent search of the carry-on bags revealed inconsistencies with his earlier responses. Kahn had been informed that defendant had purchased a one-way ticket,

with cash, shortly before departure of his flight and arrived at the airport immediately prior to take-off, behavior typical of a drug courier. Defendant had been observed en route and appeared nervous then and later at Washington National. After noticing the agents, defendant departed the terminal building and engaged a cab, leaving his luggage unclaimed at the carousel. During consensual conversation with the agents, he answered several questions untruthfully, then suddenly ended the exchange and immediately sought to leave the airport. These circumstances provided abundant articulable suspicion of illegal activity, and the agents were justified in a limited detention of defendant necessary to permit further investigation.

The record does not suggest that the ensuing detention was unnecessarily intrusive or protracted. Defendant was escorted from a congested public thoroughfare, highly inappropriate for the investigation, to the privacy of a police substation within the nearby terminal building. The "checked" luggage was quickly located and retrieved while defendant waited with the agents. Although a "dog unit" was summoned to assist in the investigation, its use, if any, occasioned only slight delay.[2] Thus, the investigation was diligently and responsibly conducted and the incidental detention brief and reasonable to the circumstances. *See Limonja,* 8 Va.App. at 543, 383 S.E.2d at 483.

Accordingly, the disputed evidence was properly gathered by the agents through both a consensual encounter and an investigatory detention and, therefore, was untainted by police misconduct.

## ABANDONMENT

Defendant next challenges the trial court's finding that he had abandoned the "checked" luggage prior to the

---

**2.** "Even in airport cases, ... there is no requirement that narcotics dogs be maintained at the airport" to avoid "inevitable delay in obtaining a dog." *Limonja,* 8 Va.App. at 543, 383 S.E.2d at 483.

search, thereby relinquishing any reasonable privacy interest in the bags or their contents.

■ "One who voluntarily abandons property forfeits any expectation of privacy he or she may have in it" and all standing to complain of its warrantless search and seizure. *Commonwealth v. Holloway,* 9 Va.App. 11, 18, 384 S.E.2d 99, 103 (1989) (citing *United States v. Thomas,* 864 F.2d 843, 845 (D.C.Cir.1989); *United States v. Kendall,* 655 F.2d 199, 200 (9th Cir.1981)). Abandonment in the context of the Fourth Amendment is distinguishable from the property law concept of abandonment. *Holloway,* 9 Va.App. at 18, 384 S.E.2d at 103. A person may retain a proprietary interest in personal property and simultaneously relinquish his or her reasonable expectation of privacy in it. *Id.*

■ "Whether a person intends to retain a reasonable expectation of privacy in property is to be determined by objective standards. Such an intent may be inferred from words, acts, and other objective facts." *Id.* (citations omitted). Two factors are particularly relevant in ascertaining intent: physical relinquishment of the property and denial of ownership. *Id.* "If a person relinquishes possession and disclaims ownership of personal property, he or she surrenders any expectation of privacy in that property." *Id.* "[R]epeated disclaimers of ownership generally constitute a relinquishment of an expectation of privacy." *Id.* A finding of an abandonment by the trial court is a determination which, "even when arguably mixed with questions of law, is subject to attack only if clearly erroneous." *Id.* at 19, 384 S.E.2d at 104.

The record in this instance disclosed abundant evidence that defendant voluntarily abandoned the "checked" luggage. Defendant elected to forego physical possession of the bags when he departed the terminal building and attempted to enter a cab, leaving the luggage at the baggage carousel. When initially questioned by the agents, he denied ownership of any "checked" bags, claiming only the two "carry-on" pieces in his possession. After Agent Jacobsen located the claim tickets, defendant equivocated, commenting, "I guess I have luggage

then." However, while walking to the police substation, he again disclaimed the "checked" bags, insisting, "I don't have any luggage with me," or "I don't have any luggage." Thus, defendant both relinquished physical possession of the baggage and expressly denied ownership, thereby clearly abandoning any privacy interests in the property.

Accordingly, the trial court correctly overruled the motion to suppress, and we affirm the convictions.

*Affirmed.*