# COURT OF APPEALS OF VIRGINIA

## Record No. 0743-24-1

XAVIER ELIJAH HUDSPETH

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Athey, Causey and Chaney
Argued at Williamsburg, Virginia

Opinion Issued April 14, 2026[*]

**FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK**
David W. Lannetti, Judge

Kelsey Bulger, Deputy Appellate Counsel (Virginia Indigent Defense Commission, on briefs), for appellant.

Craig W. Stallard, Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

**MEMORANDUM OPINION BY**
**JUDGE VERNIDA R. CHANEY**

A jury convicted Xavier Hudspeth of multiple crimes related to the murder of William Moore. On appeal, Hudspeth argues that his statements to detectives revealing the location of the same gun used in the murder were involuntary under the Fifth Amendment to the United States Constitution. He contends that the statements were induced by a promise of confidentiality regarding his cooperation and an assurance that he would receive a bond and be released within a few months if he disclosed the gun's location. He also challenges the trial court's ruling that the gun, and DNA evidence recovered from it, were admissible under the inevitable discovery doctrine.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

This Court concludes that the trial court committed no reversible error and, therefore, affirms its judgment.

## BACKGROUND[2]

### I. Commission of the Crime

On the evening of February 28, 2022, Hudspeth and Andra Brown went to William Moore's home with the intention of killing Moore and stealing guns they believed were in his house. Their plan was for Brown to shoot Moore, after which Hudspeth would enter the residence and search for the guns. When they arrived, Hudspeth handed Brown a firearm and ammunition and told him to "shoot the man." Brown approached the door, and when Moore answered, Brown shot him three times. Afterward, Brown closed and locked the door, then signaled Hudspeth to enter the home. Hudspeth waved off Brown and did not enter. Then Brown shot Moore's daughter, who was calling 911. Brown searched the house for the guns until Hudspeth called him and told him to leave. When Brown exited the home, he "took the clip out and took the bullet out [of] the head" and "threw the gun in the bush." R. 776. The two men fled the scene, splitting up when they saw police coming. Brown was arrested under an overpass and found in possession of the magazine from the gun. Shortly after the shooting, Hudspeth was arrested and interviewed.

### II. Police Interview

At about half past two in the morning, Detectives Austin and Davis began their interview with Hudspeth. Detective Austin advised Hudspeth of his *Miranda* rights, which he waived in writing. The detectives began the interview by asking, "What was going on out there before you

---

[2] "We recite the facts 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Pereira v. Commonwealth*, 83 Va. App. 431, 439 n.3 (2025) (quoting *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)). Doing so requires this Court to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

came in contact with the police?" Hudspeth told the detectives that he knew there was a shooting but that he "ain't see nothing face to face." Detective Davis responded, "I'm not saying you saw it face to face, but you do know . . . who was shooting," and "[i]f it doesn't have nothing to do with you, I need you to tell me the whole truth so I can kind of get you out of here." R. 1817. Hudspeth replied, "I know, but if I tell you the truth, that's going down a whole different path. . . . That's putting myself in danger and I can't do that." Hudspeth maintained that "[he], personally, [he] w[asn't] involved in it."

Detective Davis accepted Hudspeth's denial of involvement but continued to press Hudspeth to tell him "what's going on[.]" Hudspeth reiterated that he "can't, because that's going to put me in danger" and that he had "heard about a lot of people getting hurt from . . . talking to the police." R. 1819. He also said, "Because them statements come back now. Them statements come back. They come back in black and white. And I can't be putting myself in danger trying to help y'all. That means I can't help myself." R. 1820. He later explained that he feared being labeled a "snitch," telling detectives that he did not know "what's going to happen behind this snitching" and that he "ain't about to die no snitch." The detective explained that although Hudspeth was telling him that he was not "responsible," he "c[ouldn't] believe it unless you give me something I can work with." Hudspeth continued to resist the detective's efforts to get him to talk about what occurred at Moore's residence, maintaining that any help he gave the police would "com[e] back [to him]. They do it every time. I done seen firsthand, last time I been locked up. So I can't do nothing."

As the interview continued, Detective Davis explained that they believed Hudspeth was "absolutely involved" in the murder but that "[he] didn't pull the trigger." The detective told Hudspeth that "now is your chance to get ahead of that." Hudspeth responded, "I know exactly what happened. . . . But I can't -- I ain't trying to put my life in danger." He reiterated his

- 3 -

concern moments later, when he said, "I don't got time to be watching over my back because I'm trying to help y'all." R. 1830. Eventually, Detective Davis asked Hudspeth directly where Brown "thr[ew] his gun." Hudspeth answered that he did not see where Brown threw the gun and that Brown did not tell him where he put it. Yet Hudspeth did answer questions about where Brown emerged from Moore's house and where Brown went. After further back-and-forth, the detectives left the interview room. Another detective entered, and Hudspeth asked to speak with Detectives Austin and Davis again.

When Detective Austin entered the room, Hudspeth said, "There's only one way I can help y'all. That's if I can get out of here. Now I need to get out of here." Detective Austin responded, "We can't make promises, ok? . . . [B]ecause we're . . . not prosecutors." R. 1885. Detective Austin explained that he would have to present whatever information Hudspeth gave him to the prosecutors, but "[a]gain, we can't make promises." R. 1886. At that point, Hudspeth said, "Alright. . . . I ain't got time for this. I got a baby on the way," and told Detective Austin that he watched Brown enter the residence, heard gunshots, and refused to enter the house when Brown waved for him to enter. He explained that when Brown exited the house, he tried to give Hudspeth the gun, which Hudspeth refused, and then the men parted ways. By this time, Detective Davis had rejoined the interview. The detectives reviewed Hudspeth's story so that he could "verify" "what [he] want[ed] [them] to believe[.]" Detective Davis asked again where Brown threw the gun, and Hudspeth again denied knowing.

There was a break in the interview, and a short while later, the detectives left the room. Detective Austin returned to tell Hudspeth that the police were "getting ready to go out there and look for that gun . . . now the sun just came up." He asked Hudspeth once more whether there was "anything that you wanted to clear[]up from before." It was at this point that Detective Austin said, "So[] like I said. I'm never telling anybody anything you told me. I've got reason

- 4 -

to believe that you knew what was going on. Not that someone was going to get killed, but you knew what was going on." Detective Austin then asked, "How about this. How about you know where that gun is at?" Hudspeth responded, "Is it going to get me out of here?" The detective replied, "It is going to keep anybody else from getting hurt." Again, Hudspeth asked, "Is it going to get me out of here?" Detective Austin answered, "I can't make promises. The only one who can do that is the Commonwealth [sic] Attorney." R. 1916.

After Hudspeth said, "I'm done," Detective Austin told him that he was "not going to give up on that gun." He continued, "You already told us that you didn't shoot anybody. I've already got evidence that you didn't shoot anybody, okay? That gun is not going to come back and hurt you. That gun is going to hurt somebody if we don't get it off the street." R. 1920. A back-and-forth followed, in which Detective Austin repeatedly stated that he could not make promises and Hudspeth refused to provide any information, absent a promise that he would be released. Detective Austin eventually left the interview to return to the crime scene.

As Detective Austin left the interview room, Detective Davis entered. He started the conversation by telling Hudspeth that he "got information saying that if you can provide us with that gun, that you *might* be able to get out there in time and get a bond. You said your girlfriend was pregnant, right?" R. 1922 (emphasis added). This did not sway Hudspeth, who again said he would not help without a guarantee. Detective Davis said that "*[p]robably* you could get a bond. This is my last option. I'm just running it past you before we head out there." R. 1923 (emphasis added). When Hudspeth reiterated that he needed a guarantee, this exchange occurred:

> [Det. Davis:] I mean[,] I just gave it to you.
>
> [Hudspeth:] I know. But you said might. That's a might. That's a 50/50. That's not for guarantee.
>
> [Det. Davis:] I mean it's guaranteed you'll get a bond. You'll be out in about three months.

R. 1923. Hudspeth asked, "You for certain I'm going to make bond if I help y'all?" Detective Davis responded, "Yeah," after which Hudspeth, using a map, told Detective Davis where the police would find the gun.

### III. Police Investigation and Search for the Weapon

Shortly after the murder, the police "locked down" the neighborhood around Moore's residence and prepared for a "grid search" of an area spanning "from where both defendants were picked up at the scene, a little past that area, also back to the crime scene."[3] The designated search area included:

> everything between the crime scene, the cul-de-sac the crime scene is located on, every yard, anywhere, tops of houses, anything that we where [sic] a person could reasonably toss or hide a gun between where we were known [sic] the gun was located, which was the crime scene, and where [Brown] was detained. Every possible place that the defendants could have gone between those two[.]

R. 491-92.

Although the police "locked down" the area to be searched that night, they did not begin the search then because they were waiting for daylight. R. 519. By 9:00 a.m. the next morning, the search was ready to begin. Detective Austin, as the lead detective, was present along with approximately ten officers to assist. However, just before the search, Detective Davis contacted Detective Austin to tell him that the gun would be found in the bushes at the intersection of Orange Avenue and Mason Creek Road. The gun was recovered from that location, which was within the designated search area and approximately 20 feet from where the police gathered to begin the search. Detective Austin testified that the gun was "sort of like hanging a Christmas tree ornament" in the bush and was visible "without manipulating the" foliage. R. 493-94. He added that there was not any "doubt in [his] mind [that he] would have discovered that firearm whether [he was] directed

---

[3] Detective Austin testified at the suppression hearing that the police "locked down" the area "[i]mmediately" upon their arrival at the crime scene.

- 6 -

to it or not[.]" Subsequent DNA analysis determined that Hudspeth could not be eliminated as a contributor to the DNA found on the gun.

### IV.  Motion to Suppress and Trial

Prior to trial, Hudspeth moved to suppress his statements about the gun's location, as well as the gun itself and the DNA found on it.  He argued that the police used coercive methods to elicit his statement, rendering it involuntary.  The trial court denied Hudspeth's motion, ruling that his statement was voluntary.  It also found that the inevitable discovery doctrine applied, stating that "[t]hey would have found the gun."

The gun, the DNA recovered from it, and Brown's testimony were offered as evidence against Hudspeth during his four-day trial.  The jury convicted Hudspeth of second-degree murder, burglary while armed, two counts of using a firearm in the commission of a felony, conspiracy to commit burglary, and conspiracy to commit larceny.  The court sentenced him to 88 years of incarceration with 52 years suspended.

### ANALYSIS

When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the Commonwealth, the prevailing party below, and the defendant bears the burden to show reversible error.  *Bazemore v. Commonwealth*, 82 Va. App. 478, 490 (2024) (quoting *Sidney v. Commonwealth*, 280 Va. 517, 522 (2010)).  We are "bound by the trial court's findings of historical fact unless plainly wrong or without evidence to support them," but we review de novo the application of law to those facts and the ultimate question whether the statements were voluntary.  *Id.* at 490-91 (quoting *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc)); *Johnson v. Commonwealth*, 85 Va. App. 257, 283-84 (2025); *Keepers v. Commonwealth*, 72 Va. App. 17, 40-41 (2020).

I.  Voluntary Nature of Statements

Hudspeth contends that the trial court erred in denying "the motions to suppress [his] statements, and the evidence obtained as a result of such statements, because the statements were made involuntarily."  He argues that the detectives used coercive interrogation techniques and made two promises that overbore his will: (1) that his statements would not be used against him and (2) that he would receive bond if he disclosed the location of the gun.  This Court concludes that the record does not establish that the trial court committed reversible error in ruling that Hudspeth's statements were voluntary.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.

> Not only does the Fifth Amendment establish a person's right not to testify when one is a defendant in a criminal trial but also "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."

*J.D. v. Commonwealth*, 42 Va. App. 329, 339 (2004) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)).  "A defendant who makes incriminating statements after being warned under *Miranda* may move to suppress those statements on the ground that . . . his confession . . . was coerced and not voluntary."  *Johnson*, 85 Va. App. at 275 (quoting *Thomas v. Commonwealth*, 82 Va. App. 80, 101 (2024)).  To determine voluntariness, this Court examines "the totality of the circumstances to determine whether the statement is the 'product of an essentially free and unconstrained choice by its maker,' or whether the maker's will has been overborne and his capacity for self-determination critically impaired."  *Johnson*, 85 Va. App. at 284 (quoting *Rodriguez v. Commonwealth*, 40 Va. App. 144, 157 (2003)).  Relevant considerations include the "interrogation techniques

employed"—such as "trickery and deceit,"[4] "psychological pressure, threats or promises of leniency," and the duration and "circumstances of the interview"—as well as the accused's age, intelligence, mental and physical condition, and experience with the criminal justice system. *Keepers*, 72 Va. App. at 41 (quoting *Washington v. Commonwealth*, 43 Va. App. 291, 302-03 (2004)). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Bottenfield v. Commonwealth*, 25 Va. App. 316, 323 (1997) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

Hudspeth's primary challenge focuses on the detectives' alleged promises of confidentiality and bond, but he also points to the length and tone of the interrogation as evidence of coercive police activity.

---

[4] Hudspeth first characterizes the detectives' promises as "false" or misleading, and then argues that it does not matter whether the detectives believed what they said at the time. However, Hudspeth cites no Virginia authority holding that a police misrepresentation, standing alone, categorically renders a confession involuntary. *See, e.g.*, *Arthur v. Commonwealth*, 24 Va. App. 102, 106 (1997) ("Virginia appellate courts consistently have held that a lie by a law enforcement officer 'does not, in and of itself, require a finding that a resulting confession was involuntary.'" (quoting *Rodgers v. Commonwealth*, 227 Va. 605, 616 (1984))). Instead, Hudspeth relies on decisions from other jurisdictions. *See State v. Galli*, 967 P.2d 930, 936 (Utah 1998); *State v. Rettenberger*, 984 P.2d 1009, 1015 (Utah 1999); *Commonwealth v. Jackson*, 386 N.E.2d 15, 21 n.8 (Mass. 1979); *State v. Gonzales*, 268 A.3d 329, 344 (N.J. 2022) (Albin, J., concurring); *State v. L.H.*, 215 A.3d 516, 529 (N.J. 2019); *United States v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009); *United States v. Hunter*, 912 F. Supp. 2d 388 (E.D. Va. 2012); *Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987); *Ferguson v. Boyd*, 566 F.2d 873, 876 (4th Cir. 1977); *Gilliam v. Sealey*, 932 F.3d 216, 236 (4th Cir. 2019). Because we are a "court[] of review, not first view," and because a determination of falsehood is neither necessary to our decision nor dispositive of Hudspeth's appeal, we make no findings on that issue. *Reed v. Commonwealth*, 85 Va. App. 196, 216 (2025) (alteration in original) (quoting *Commonwealth v. Holland*, 304 Va. 34, 38 (2025)); *see also Perkins v. Commonwealth*, 84 Va. App. 519, 526 n.7 (2025) ("Virginia appellate courts strive to decide cases on the best and narrowest grounds available." (quoting *Carter v. Commonwealth*, 79 Va. App. 329, 349 n.9 (2023))).

A. *Interrogation techniques and circumstances*

On this record, the techniques employed by the detectives were not inherently coercive. The interview lasted around seven hours, with multiple breaks, and the record reflects no deprivation of sleep, food, or basic necessities, nor any threats or physical coercion. A substantial portion of the interrogation consisted of Hudspeth conditioning his cooperation on assurances of release. He told the detectives, "There's only one way I can help y'all. That's if I can get out of here. Now I need to get out of here[,]" and asked, when pressed about the gun, "Is it going to get me out of here?" R. 1885, 1916. These exchanges show Hudspeth repeatedly conditioning his willingness to "help y'all" on "get[ting] out of here," and the detectives responding that they "can't make promises" and are "not prosecutors." R. 1885-86, 1916-17.

The trial court expressed concern about the detectives' methods, noting that "police interrogation tactics are routinely less than a hundred percent honest" but observing that such tactics are "allowed." Viewed under the totality-of-the-circumstances, and giving due deference to the court's supported factual findings, we reach the same legal conclusion.

Here, the detectives urged Hudspeth to cooperate and appealed to his concern for his pregnant girlfriend. However, the record does not reflect evidence of psychological coercion—such as threats, deprivation, or unrelenting questioning—of the kind courts have found sufficient to render statements involuntary. *See Keepers*, 72 Va. App. at 41 (rejecting the appellant's allegation of "tremendous" psychological pressure where her "candor" in the interview reflected its relaxed environment and the appellant "remained steadfast in her position" that she was not present at the scene of a murder). Nor do the interview's duration and setting, viewed in light of the breaks and the absence of evidence of deprivation, compel a finding that the interview was overly coercive.

B. *Hudspeth's personal characteristics*

The record does not show that Hudspeth's personal characteristics rendered him unusually susceptible to coercion. At the time of the interview, he was a legal adult, and nothing in the record suggests that his age, intelligence, or mental or physical condition impaired his ability to understand and exercise his rights. Officer testimony at the suppression hearing reflected no concerns about developmental or cognitive limitations. A detective from the Old Dominion University Police Department testified that he interviewed Hudspeth when he was arrested for stealing a vehicle. The detective's testimony supports the inference that Hudspeth had some prior exposure to the criminal justice system.

Throughout the interrogation, Hudspeth articulated his concerns clearly, stating, "I ain't trying to put my life in danger," and, "I don't got time to be watching over my back because I'm trying to help y'all." He repeatedly asked whether cooperation would secure his release and tried to condition his assistance on his release from custody. In short, the record reflects that Hudspeth understood the stakes and was attempting—unsuccessfully—to extract assurances from the detectives. The trial court was not plainly wrong to conclude that Hudspeth's personal characteristics did not render his statements involuntary.

C. *Promises to Hudspeth*

Hudspeth's primary argument is that two promises rendered his statements involuntary. First, that his statements would not be used against him. Second, that he would receive bond if he revealed the gun's location. We address each in turn.

1. Confidentiality promise

Hudspeth contends Detective Austin's statements that "I'm never telling anybody anything you told me," and, in urging him to disclose the gun's location, that "that gun is not

- 11 -

going to come back and hurt you," led him to believe he could "speak freely, and his statements would not be used against him later." The surrounding context undermines that interpretation.

First, Hudspeth had already been advised under *Miranda* that "anything you say can and will be used against you in court" and signed a written waiver acknowledging he understood this warning. Nothing in the record suggests that he attempted to revoke that waiver based on Detective Austin's later reassurance or that Austin purported to retract the *Miranda* warning. Second, before Austin's "never telling anybody" remark, Hudspeth repeatedly emphasized that he did not want to be labeled a "snitch" and feared retaliation, explaining, "Because at the same time if I help y'all I'm still sacrificing my future. You don't know what's going to happen behind this snitching. . . . I ain't about to die no snitch." He also told detectives, "Because them statements come back now. Them statements come back. They come back in black and white. And I can't be putting myself in danger trying to help y'all. That means I can't help myself." R. 1820. At the suppression hearing, Austin testified that he made the "never telling anybody" statement because he viewed Hudspeth as a potential witness against Brown and understood that Hudspeth feared the "ramifications for talking on him" on the street.

Virginia precedent establishes that even deliberate falsehoods by interrogators are "but another factor" in the totality analysis and do not automatically render a confession involuntary, absent evidence that the suspect's will was actually overborne. *Harrison v. Commonwealth*, 244 Va. 576, 583-84 (1992); *Rodgers v. Commonwealth*, 227 Va. 605, 616 (1984); *see also Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (police misrepresentation that an accomplice had confessed did not render the defendant's confession involuntary). Moreover, Hudspeth was aware that any statement could be used against him in court, and he reflected that awareness by telling the detectives that anything he told them could leave the room and eventually "go . . . to the judge." Even still, after that, he made his admissions. Accordingly, the trial court did not err in

concluding that Hudspeth's statements were not the product of coercion by Detective Austin's remark.

## 2. Bond promise

Hudspeth also argues that Detective Davis's bond remarks—"I mean it's guaranteed you'll get a bond. You'll be out in about three months"—were guarantees of liberty that rendered his subsequent statement about the gun's location involuntary. Hudspeth relies on the rule articulated in *Belcher v. Commonwealth*, 160 Va. 891 (1933), that "[w]here the accused is led to believe that his statement will have the effect to free him, such a powerful inducement is thus presented to his mind as to lead him to make it without regard to its truth or falsity, and hence it is involuntary." 160 Va. at 905-06 (quoting 2 Wharton's Crim. Evid. § 653a (10th ed. 1912)).

*Belcher* is distinguishable. In *Belcher*, the main concern was that the accused gave a statement for the Commonwealth under the belief that his statement would lead to his immunization from prosecution. *See id.* at 905 ("The testimony of the Commonwealth's attorney shows that . . . he intentionally so conducted his conversations . . . to raise in the mind of William Belcher the hope and belief that . . . he would not be prosecuted."). Here, by contrast, the record shows that Hudspeth, rather than the detectives, initiated efforts to bargain for his release and that the detectives repeatedly told him that they could not make promises. During the interrogation, Hudspeth told Austin, "There's only one way I can help y'all. That's if I can get out of here," to which Austin responded, "We can't make promises, ok? . . . [B]ecause . . . we're not prosecutors." When Austin later asked directly for the gun's location, Hudspeth replied, "Is it going to get me out of here?" and Austin again said he "can't make promises," emphasizing that only the Commonwealth's Attorney could do so. R. 1916. Throughout the interview, the detectives repeatedly told Hudspeth that they could not promise him anything. On

this record, although Detective Davis later used the language of a "guarantee," the trial court could reasonably conclude that this interrogation, viewed as a whole, did not present the same kind of inducement as described in *Belcher*.

After Austin left to participate in the grid search, Davis returned and told Hudspeth that if he provided the gun, he "*might* be able to get out there in time and get a bond," and then, when Hudspeth continued to demand a guarantee, said, "I mean it's guaranteed you'll get a bond. You'll be out in about three months." (Emphasis added). Moments later, Hudspeth asked, "You for certain I'm going to make bond if I help y'all?" and Davis responded, "Yeah," after which Hudspeth used a map to identify where the police would find the gun.

Hudspeth argues that his disclosure of the gun's location was coerced by Detective Davis's assurance that "I mean it's guaranteed you'll get a bond. You'll be out in about three months," followed by Davis's "Yeah" when Hudspeth asked, "You for certain I'm going to make bond if I help y'all?" Although Davis's words were phrased in absolute terms, the trial court was entitled to consider that statement in the full context of the interview rather than in isolation. Davis spoke in terms of a future decision about release on bond—an inherently discretionary judicial determination that detectives had no authority to guarantee. Before that exchange, the detectives had repeatedly told Hudspeth that they could not make promises and that only the Commonwealth's Attorney could do so. Hudspeth's own responses showed that he understood the difference between a possibility or "might," and a guarantee and that he was attempting to bargain for release rather than simply yielding to police pressure. The surrounding context therefore allowed the trial court to find that Davis's language could not reasonably be understood as a binding guarantee that overbore Hudspeth's will.

Considering the evidence in the light most favorable to the Commonwealth—and the detectives' multiple admonitions[5] that only the Commonwealth's Attorney could make promises—Hudspeth's prior exposure to law enforcement, his expressed understanding that "they do it every time" when people talk to police, and his insistence on a "guarantee" support the inference that he understood detectives could not themselves order his release.

We do not discount that the prospect of release on bond carried particular weight for Hudspeth, given his repeated references to his pregnant girlfriend and his desire to "get out of here." But the detectives had repeatedly told him they could not make promises and that only the Commonwealth's Attorney and the courts could effect his release, and the court found that their conduct, taken as a whole, did not overbear his will. As our Supreme Court has recognized, "[p]romises of lenience designed to induce an accused to cooperate 'have generally been found insufficient to overbear a defendant's free will.'" *Harrison*, 244 Va. at 584 n.2 (quoting *Rodgers*, 227 Va. at 616). Such promises are not alone dispositive; instead, they are considered as part of the totality of the circumstances. *Id.*

Considering both alleged promises against the backdrop of the entire interrogation and Hudspeth's own conduct, the trial court could reasonably find that the detectives' statements did not overbear his will.

### D.  *Totality of the circumstances*

We acknowledge that Hudspeth advances serious concerns about the detectives' tactics regarding their promises of confidentiality and bond. In urging us to find his statement

---

[5] Throughout the interview, detectives repeatedly told Hudspeth that they could not promise him release or bond: "We can't make promises okay? . . . [B]ecause . . . we're not prosecutors"; "I can't make promises. The only one that can do that is the Commonwealth [sic] Attorney"; "And I'd be lying if I did. The only one that can make that promise is the Commonwealth," R. 1918; "I am also not saying that it's not going to help. . . . I don't know what the Commonwealth can do with it"; and "And again, I can't make promises. The only one that can is the Commonwealth [sic] Attorney."

involuntary, Hudspeth relies on *Belcher*, 160 Va. at 905-06, as well as federal decisions involving promises of immediate release or assurances that a statement would not be used in court. *See Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987) ("Similarly, certain promises, if not kept, are so attractive that they render a resulting confession involuntary. A promise of immediate release or that any statement will not be used against the accused is such a promise." (citation omitted)); *United States v. Shears*, 762 F.2d 397, 401-02, 402 n.5 (4th Cir. 1985) ("[T]he defendant's reasonable perception that he had been promised that all charges on unrelated offenses would be dropped, a perceived promise that was not fulfilled, was the principal and determinative factor leading to this confession, which was therefore involuntary."). In *Belcher*, the Court explained that where an accused is led to believe that his statement will "have the effect to free him," such an inducement renders the statement involuntary. *Belcher*, 160 Va. at 905-06.

The cases Hudspeth cites illustrate that certain inducements can, in some cases, overbear a suspect's will, but they do not create a per se rule that any promise of future bond renders a confession involuntary. Under Virginia law, even promises of leniency are one factor in the totality analysis and are "generally . . . insufficient to overbear a defendant's free will." *Harrison*, 244 Va. at 584 n.2 (quoting *Rodgers*, 227 Va. at 616). Under *Connelly*, 479 U.S. at 167, coercive police activity is a necessary predicate to a finding of involuntariness, so Virginia precedent requires courts to evaluate any promises or inducements within the totality of the circumstances rather than treating them as dispositive in isolation.

Reviewing the entire interrogation transcript, we note that it reflects a multi-hour interview, but no physical coercion or deprivation. It also shows a defendant who clearly articulated his fear of retaliation, repeatedly insisted that he was not trying to "put [his] life in danger," and attempted to condition his cooperation on getting out of jail. In light of these

circumstances and our deferential standard of review, we cannot conclude that the trial court erred in finding that Hudspeth's statements were "the product of an essentially free and unconstrained choice" rather than the result of overbearing police coercion. *Johnson*, 85 Va. App. at 284 (quoting *Rodriguez*, 40 Va. App. at 144).

## II. Inevitable Discovery

Separate from and independent of its ruling on the voluntary nature of Hudspeth's statements, the trial court also determined that suppression of the firearm and DNA evidence obtained from the gun was not warranted because of the doctrine of inevitable discovery. Since Hudspeth seeks suppression of physical evidence allegedly obtained through unlawful police conduct, this claim implicates the Fourth Amendment to the United States Constitution. The trial court stated,

> I think that they, of course, if they didn't have the statement from Mr. Hudspeth as to where the gun was they were going to look for the gun. And I believe Detective Austin's testimony that they were going to start, in fact, where it was. . . . I think the inevitable discovery doctrine is applicable.

R. 560.

The doctrine of inevitable discovery provides an exception to the general rule that evidence obtained by unlawful means is subject to suppression. *Commonwealth v. Jones*, 267 Va. 532, 535 (2004). It is "intended to put the police in the same position they would have been in without the error or misconduct." *Carlson v. Commonwealth*, 69 Va. App. 749, 763 (2019). The inevitable discovery exception applies when evidence obtained by unlawful means would have "ultimately or inevitably been discovered by lawful means." *Knight v. Commonwealth*, 71 Va. App. 771, 787 (2020) (quoting *Carlson*, 69 Va. App. at 763). Thus, to prove that the exception applies, the Commonwealth must prove, by a preponderance of the evidence, "(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police

- 17 -

misconduct, [and] (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct." *Jones*, 267 Va. at 536 (quoting *United States v. Cherry*, 759 F.2d 1196, 1204 (5th Cir. 1985)).[6] We consider these elements in turn.

The first element of the inevitable discovery exception requires a reasonable probability that police would have found the gun absent Hudspeth's statements. The evidence, as found by the trial court, shows that before Hudspeth disclosed the gun's location, officers had locked down the neighborhood for a daylight grid search that included the yard where the gun was ultimately recovered. They planned to search "every yard" and any place a gun could reasonably be tossed between the crime scene and Brown's arrest location, and the firearm was hanging in a low shrub within that area, visible without manipulating the foliage. R. 481, 483-84, 490-93. Detective Austin also testified that nothing covered the firearm to keep someone from noticing it, that the bush where it was found was part of the grid-search area, and that he had no doubt the officers would have discovered it even if they had not been directed to it. On those facts, the court could reasonably conclude there was a reasonable probability the grid search would have uncovered the gun even without Hudspeth's statement.

The Commonwealth also established that officers possessed lawful means to discover the gun. The record reflects no intention or need to enter Moore's home or other constitutionally protected spaces; the planned grid search covered outdoor areas, including "every yard" and "anything or anywhere a gun could be tossed or thrown" between the crime scene and Brown's arrest location. The record also supports the conclusion that the gun was visible in the bush without

---

[6] Earlier Virginia cases described a third requirement that the Commonwealth show that police were actively pursuing an alternative line of investigation at the time of the alleged illegality. In *Jones*, however, the Supreme Court articulated the doctrine into the two-part test quoted in the text, and we apply that formulation here. 267 Va. at 536-38.

manipulating the foliage and was located near a street and sidewalk.[7] On these facts, the trial court could conclude that officers would have lawfully recovered the gun during the planned grid search.

The second element of the inevitable discovery doctrine requires the Commonwealth to prove that law enforcement possessed leads to lawfully recover the evidence at the time of the alleged misconduct. *Jones*, 267 Va. at 536. The record shows that, within hours of the murder and while it was still dark, Detective Austin and other officers had already locked down a neighborhood area for a grid search for the gun and the designated search zone included the yard where it was ultimately found. After Austin left the interview to participate in that search, Hudspeth revealed the gun's location. As noted above, the firearm was recovered in that area, hanging in a low bush and visible without manipulating the foliage.

Viewing this evidence, and the reasonable inferences drawn from it, in the light most favorable to the Commonwealth, it establishes that before Hudspeth disclosed the gun's location, police had already identified an outdoor grid-search area that encompassed the spot where the gun was recovered. Accordingly, the Commonwealth satisfied the second requirement of the inevitable discovery exception, and the trial court did not err in its application.

Hudspeth's argument against the application of the inevitable discovery doctrine rests on distinguishing his case from *Nix v. Williams*, 467 U.S. 431 (1984), the seminal case adopting the inevitable discovery doctrine. Although he acknowledges that *Nix* "involved facts similar to this case, [as] the suspect directed the police to a specific piece of evidence[,]" he contends that "[t]he

---

[7] "Our review includes 'evidence adduced both at the trial and the suppression hearing.'" *Carlson*, 69 Va. App. at 758 (quoting *Greene v. Commonwealth*, 17 Va. App. 606, 608 (1994)).
We need not decide the precise scope of any plain-view theory here. Even assuming without deciding that officers had to enter onto another landowner's property before the gun came into view, Hudspeth cannot "vicariously assert[]" the rights of that landowner because he had no privacy interest in the property. *Id.* at 764 n.7 (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)).

search in *Nix* . . . that the Court concluded would have led to the discovery of the body was far more sophisticated and established than the one here."[8] This comparison does not persuade us.

In *Nix*, after a child was abducted and killed, law enforcement organized a large-scale, grid-style search involving approximately 200 volunteers instructed to examine "all roads, abandoned farm buildings, ditches, culverts, and any other place in which the body of a small child could be hidden" over several miles between two Iowa towns. 467 U.S. at 435. While that search was underway, Williams made incriminating statements and ultimately led officers to the victim's body, which was found near a culvert within the area already marked to be searched and about two and a half miles from the location of one group of searchers when the search was temporarily halted. *Id.* at 436, 449-50. The Court adopted the inevitable discovery doctrine and held that, given the scope and organization of the search and the proximity of the searchers to the body, "the volunteer search teams would have resumed the search" and the body "inevitably would have been found" even absent Williams's statements. *Id.* at 448-50.

Hudspeth emphasizes that, unlike in *Nix*, there were only about ten officers here, the grid search had not yet begun when he disclosed the gun's location, and there was "no evidence in the record that the police would have searched that precise yard, or that [precise] bush" where the gun was found. Those factual differences do not undermine the trial court's conclusion that discovery of the gun was inevitable. The record establishes that, before Hudspeth's disclosure, officers had already "locked down" the neighborhood and planned a grid search of "everything between" the crime scene and Brown's arrest location, including "every yard" and "anywhere" a gun could reasonably be tossed or hidden. The bush where the gun was recovered lay within that pre-defined search area. The gun was found about twenty feet from where the officers gathered to begin the

---

[8] Hudspeth's argument regarding *Nix* is limited to this assertion without further development or discussion of the case.

- 20 -

search and was hanging "sort of like" a "Christmas tree ornament" and visible "without manipulating the" foliage. R. 483-85, 493.

On these facts, the question is not whether this search matched *Nix* in scale, but whether there was a reasonable probability that officers, executing the planned grid search of a smaller, already-secured perimeter, would have discovered a plainly visible firearm within feet of their starting point. The trial court reasonably found that they would have done so and that the Commonwealth satisfied both elements of the inevitable discovery exception.

CONCLUSION

For these reasons, we conclude that the trial court committed no reversible error in denying Hudspeth's motion to suppress or in applying the inevitable discovery doctrine. Therefore, this Court affirms its judgment.

*Affirmed.*